GARDEN VIEW, LLC, Plaintiff-Appellee, v. LEON FLETCHER, Defendant-Appellant.

First District (4th Division) No. 1—08—1077

Opinion filed August 27, 2009.

Legal Assistance Foundation of Metropolitan Chicago, of Chicago (Michelle J. Gilbert, Michelle Wetzel, and Julie M. Harcum, of counsel), for appellant.

Mayer Brown LLP, of Chicago (Sarah E. Rauh, of counsel), for appellee.

JUSTICE STEELE delivered the opinion of the court:

Plaintiff, Garden View, LLC[1] (Garden View), filed a forcible entry and detainer complaint seeking an order of possession for the apartment that defendant, Leon Fletcher, leased after illegal drugs were found in his apartment. Following a bench trial,[2] the trial court entered the order of possession, finding that Fletcher had violated his lease. Fletcher appeals from the judgment, asserting that the trial court: (1) applied the incorrect standard in determining whether Garden View properly terminated his lease; (2) improperly allowed Garden View to call Fletcher as an adverse witness without prior notice and in violation of an *in limine* order; and (3) erroneously failed to provide for an official court reporter to transcribe the trial proceedings under the statutory cost waiver due to his indigent status. For the following reasons, we affirm the trial court's judgment.

## BACKGROUND

Garden View is a not-for-profit organization that provides subsidized housing for individuals living with HIV/AIDS and their families in Chicago. Garden View receives funding pursuant to its delegate agency agreement (Agreement) with the Chicago Department

---

[1]AidsCare, Inc. is the parent company of Garden View. The record refers to Garden View as Garden View or AidsCare. For our purposes, we will refer to plaintiff as Garden View.

[2]Before the trial began, the parties stipulated to a bench trial although Fletcher filed a jury demand.

of Public Health (CDPH). The funding comes through a federal program administered by the United States Department of Housing and Urban Development (HUD) and known as "Housing Opportunities for Persons with AIDS" (HOPWA) (42 U.S.C. §§12901 through 12921 (2006)), which was established by the AIDS Housing Opportunities Act (Pub. L. No. 101—625, §851, 104 Stat. 4079, 4375 (1990)).

In its Agreement, Garden View receives HOPWA grant funds "to devise long-term comprehensive strategies for meeting the housing needs of persons with AIDS or related diseases and their families." Additionally, the Agreement requires Garden View to comply with grant conditions, and all federal, state and local laws, regulations, rules, policies, and executive orders regarding the grant. Further, the Agreement requires Garden View to administer a policy ensuring that the facility "is free from the illegal use, possession, or distribution of drugs or alcohol" by the residents and maintain a drug-free workplace in accordance with pertinent federal and state statutes, CDPH regulations, and local government guidelines.

On April 5, 2007, Fletcher signed a lease for an apartment at Garden View's facility after moving from a neighboring building owned and operated by Garden View's parent company. Anjanette Young, Garden View's property manager, reviewed the lease provisions, including the prohibition against illegal drug activity, with Fletcher when he signed the lease. Fletcher is an individual living with HIV, bone cancer, and other ailments. He also takes various medication for his illnesses. Fletcher was the sole resident of the apartment. Some relatives and their friends assisted Fletcher in moving into the new apartment over several days.

On April 6, 2007, Young discovered suspected marijuana in Fletcher's bedroom after he permitted her to look around his apartment when she went there to discuss a matter with him. On May 2, 2007, Young served a lease termination notice upon Fletcher. On June 1, 2007, Garden View filed a forcible entry and detainer complaint seeking an order of possession of the premises based upon a breach of the lease terms.

On March 21, 2008, the trial court denied Fletcher's motion to appoint an official court reporter to transcribe the proceedings. Additionally, the trial court denied the parties' cross-motions for summary judgment. After Garden View filed a motion to instruct the jury regarding the relevant legal standard, the trial court determined that the lease terms governed the proceedings. Prior to trial, the parties also filed various motions *in limine.* The trial court entered orders *in*

*limine*, including orders referencing trial witnesses and excluding references to supportive services.[3]

On March 27, 2008, the trial court commenced a bench trial. Young testified that on April 6, 2007, she, while accompanied by a private security guard, Sergeant Henry Irving, Jr., went to Fletcher's apartment. After Young entered the apartment with Fletcher's permission, she smelled suspected marijuana smoke. Fletcher also gave Young and Irving permission to inspect his apartment, including his bedroom. Young and Irving looked around the apartment, discovering small baggies with dollar signs on them on a kitchen table. After momentarily leaving the apartment to obtain a Ziploc baggie from Fletcher's next-door neighbor, Young placed the items, as well as some glass tubes with burn marks, in the bag. When she went into the bedroom, she discovered a partially burned cigarette containing suspected marijuana in an ashtray on a night stand next to his bed. She also observed a bag containing suspected marijuana and a box of cigarettes on the night stand after picking up the ashtray. Young advised Fletcher that she would have to have him arrested due to Garden View's zero tolerance for illegal drugs. Young wrote notes about her observations and discovery of certain items, which Fletcher signed.

Garden View then called Fletcher as a witness. Over Fletcher's counsel's objections that Garden View failed to disclose Fletcher as a witness and called him to testify in alleged violation of an order entered *in limine*, the trial court allowed Fletcher to testify as an adverse witness. Fletcher admitted that he signed the Garden View lease when he moved into the apartment. He also admitted that he allowed Young and Irving to enter his apartment, during which they discovered some tiny bags and a glass tube in a garbage box that he had unpacked. Fletcher further testified Young left his apartment for a few minutes to go across the hall, but Irving continued to look around. When she returned, Young placed the objects in the bag she obtained from the neighbor and continued to look around his apartment, as she already had his permission to do so. Moreover, he admitted a hand-rolled item was found in an ashtray in his bedroom, he was the only person on the lease and with keys to the apartment, and he was alone in the apartment when they arrived. He testified that after the suspected marijuana was discovered, he signed Young's notes below language stating he "also admits to currently smoking M." and documenting her observations and his admissions about his actions to her. He stated the half-smoked object, which was smoked that morning, contained tobacco.

---

[3]On April 2, 2008, the trial court entered an order granting certain motions *in limine* filed by Garden View *nunc pro tunc* March 26, 2008.

Upon his attorney's examination, Fletcher denied reading Young's notes before signing them or having a choice in signing the notes.

Chicago police officer Marlon Lima testified that he and a probationary police officer responded to the call at Garden View's facility on April 6, 2007. As part of his arresting Fletcher, Officer Lima recovered a half-smoked cigarette and a small, clear plastic bag containing suspected marijuana, which he placed in his pocket while he effected the arrest and were later inventoried. On cross-examination, Officer Lima admitted that he did not enter Fletcher's apartment, but expressed his belief that Fletcher "was under the influence of something" when he arrested him. However, he admitted that he did not inventory the pipe discovered and arrested Fletcher for possessing less than 2.5 grams of marijuana.

Daniel Beerman, a forensic scientist assigned to the drug chemistry section at the Forensic Science Center of the Illinois State Police, testified he analyzed the hand-rolled cigarette and the object in the plastic bag forwarded to his office. While the cigarette was not analyzed, subsequent weighing and testing confirmed that the plastic bag found in Fletcher's apartment contained 0.4 grams of marijuana. Moreover, he explained that the partially burnt hand-rolled item was not analyzed because, due to policy, both objects weighed less than the 2.5-gram minimum.

Eric Homer, the chief programs officer for Garden View's parent company, testified that he had worked for AidsCare for $3\frac{1}{2}$ years at the time. He testified that AidsCare had a zero-tolerance policy for possession or use of illegal drugs in its facilities. Homer explained that the policy was to provide a safe haven for persons recovering from alcohol and drugs, as well as for persons who never used illegal drugs. He also noted that small children reside in the buildings. Homer further testified about the importance of consistency in enforcing the policy and its effect in plans for developing new programs.

Upon cross-examination, Homer described AidsCare's mission as providing housing for persons living with AIDS, some of whom happen to be recovering from substance abuse problems. He testified that any relapse involving possession or use of illegal drugs in the facility results in an automatic eviction. Further, he stated that he conferred with Young in terminating Fletcher's lease. Lastly, he admitted that he was not in Fletcher's apartment on the day in question.

As part of the defendant's case, Irving testified that he provided security through a third party at the Garden View facility. He admitted that he removed Fletcher's handcuffs so that he could sign Young's notes, but then kept him handcuffed until the police arrived. On cross-examination by Garden View's counsel, Irving testified that he smelled

suspected marijuana when he entered Fletcher's apartment with Young.

Lastly, Fletcher testified on his own behalf. He denied Young reviewed the lease provisions with him. He also denied reading the lease before he signed it. Further, Fletcher testified he would not have permitted Young to look around his apartment if he was smoking marijuana that morning. He stated he felt "woozy" and was half asleep due to medications when Young arrived. Indeed, he denied having smoked marijuana that morning. Yet, he admitted that she found "some little baggies, a broke up pipe, and *** a Cigarillo box with some marijuana in it." He denied seeing the objects beforehand, including the bag of marijuana before Young found it in his bedroom, and insisted that someone else left the marijuana in the apartment. He explained that he thought Young was asking him if he had ever consumed marijuana, as opposed to on that day, when he admitted to Young that he smoked marijuana. He admitted smoking a "roach cigarette" and stated it was less expensive to smoke hand-rolled cigarettes. Lastly, he denied reading Young's notes before he signed them and contended Young characterized his signature at the bottom of her notes as an admission.

At the conclusion of the testimonies, the trial court entered judgment for Garden View finding "a clear violation of the lease." The order of possession was entered on April 2, 2008, and stayed until August 1, 2008, conditioned on timely payment for Fletcher's use and occupancy.

On April 24, 2008, Fletcher filed a timely appeal, which was amended on April 25, 2008.

## DISCUSSION

### I. Standard for Terminating Occupancy

■ Fletcher first contends that the pertinent regulations imposed a higher burden on Garden View in terminating his lease.[4] This court interprets statutes *de novo*. *Country Mutual Insurance Co. v. State Farm Mutual Automobile Insurance Co.*, 339 Ill. App. 3d 78, 81 (2003); but see *Cyclonaire Corp. v. ISG Riverdale, Inc.*, 378 Ill. App. 3d 554, 559 (2007) (trial court's findings of fact entitled to "great deference"). When interpreting a statute, the court's primary objective is to

---

[4]On March 3, 2009, this court entered an order denying Fletcher's motion to supplement the record on appeal with documents that were rejected and not considered by the trial court. We believe the record contains sufficient documents and information for this court to adequately resolve the issue of statutory interpretation presented in the appeal.

ascertain and give effect to the legislative intent, which is gleaned from the plain and ordinary language of the statute. See *Country Mutual*, 339 Ill. App. 3d at 82. The statute is read in its entirety, and no word is interpreted to render the word meaningless. *Country Mutual*, 339 Ill. App. 3d at 82, citing *Temesvary v. Houdek*, 301 Ill. App. 3d 560, 565 (1998).

A judgment entered after a bench trial is reviewed to determine if the trial court's findings were against the manifest weight of the evidence. *Fox v. Heimann*, 375 Ill. App. 3d 35, 46 (2007). A judgment is deemed against the manifest weight of the evidence only where the opposite conclusion is apparent, or when findings appear arbitrary, unreasonable, or not based on the evidence. *Fox*, 375 Ill. App. 3d at 46. In support of his position, Fletcher cites the federal regulations pertaining to HOPWA, which provide in pertinent part the following:

"(e) *Termination of assistance*—***

(2) *** Assistance to participants who reside in housing programs assisted under this part may be terminated if the participant violates program requirements or conditions of occupancy. Grantees must ensure that supportive services are provided, so that a participant's assistance is terminated only in the most severe cases." 24 C.F.R. §574.310(e)(2)(i) (2007).

In denying Fletcher's motion to apply a higher standard, the trial court concluded that the terms of the lease governed whether Garden View properly terminated his occupancy and was entitled to possession of the apartment. Fletcher construes this regulation as requiring Garden View not only to show that it provided supportive services to him before terminating his tenancy, but also to warrant terminating his tenancy only in "the most severe case." The parties also dispute whether this provision applies based upon if Garden View is a grantee under the regulations.[5] While we interpret the regulations as not requiring Garden View to provide supportive services or demonstrate that supportive services were rendered before terminating housing for violating the conditions of Fletcher's occupancy, we disagree with Garden View to the extent it seeks exemption from complying with the implementing regulations at all, because it does not meet the definition of grantee.[6] The regulations define a grantee as "the person or legal entity to which a grant is awarded and that is accountable for

---

[5]We note some confusion may have occurred as Garden View's agreement with CDPH refers to Garden View as the subgrantee.

[6]Just as Garden View seeks to obligate Fletcher to comply with the contractual terms of his lease, Garden View cannot ignore the language in the Agreement. In the Agreement, Garden View agreed, among other things, to "comply with all provisions of the Grant, and all federal, state and local laws,

the use of the funds provided." 24 C.F.R. §5.100 (2007); see 24 C.F.R. §574.3 (2007) (referring to section 5 for definition of grantee).

Here, instead, we find that Garden View fits the description of a project sponsor, defined as "any nonprofit organization or governmental housing agency that receives funds under a contract with the grantee to carry out eligible activities under this part." 24 C.F.R. §574.3 (2007); see also 42 U.S.C. §12902(14) (2006) (defining project sponsor as a nonprofit organization or housing agency of a state or unit of general local government that contracts with a grantee to receive assistance under this chapter). HOPWA also provides that grantees carry out activities outlined in HOPWA through their project sponsors. 42 U.S.C. §12903(b) (2006). Indeed, the regulations note that nonprofit organizations that are ineligible to apply to HUD directly may receive federal funding as a project sponsor under contract with a grantee. 24 C.F.R. §574.210(c) (2007). However, our finding does not conclude Garden View could never be considered a grantee under the regulations. See 24 C.F.R. §574.210(a) (2007) (nonprofit organizations may apply for grants for projects of national significance).

In arguing that his lease termination was improper, Fletcher focuses on two phrases in the pertinent regulation. Before reaching the phrases, Fletcher conveniently ignores the first sentence, which must be considered in interpreting the provision. The regulation clearly envisions that termination of housing may occur under certain circumstances, *i.e.*, violating conditions of occupancy. 24 C.F.R. §574.310(e)(i) (2007). Having already concluded that Garden View is not a grantee, we consider whether Garden View was bound to "ensure that supportive services are provided" to eligible participants in considering to terminate housing assistance. We agree with Garden View that CDPH was the responsible party, as the grantee, for ensuring that supportive services are provided to residents. The regulations define supportive services as including, but not limited to, health, mental health, drug and alcohol abuse treatment and counseling. 24 C.F.R. §574.300(b)(7) (2007). While the regulations appear to require that supportive services be provided as part of rental assistance to individuals such as Fletcher, the language does not support an interpretation that a project sponsor must provide both simultaneously. Indeed, the regulations note that HOPWA funds may be used

---

ordinances, policies, guidance, regulations, rules and executive orders relating to the Grant, including, but not limited to *** AIDS Housing Opportunity Act, 42 USC 12901 *et seq.* and implementing regulations at 24 CFR 574."

independent of any housing activity in providing supportive services to eligible individuals. 24 C.F.R. §574.300(a) (2007).[7]

Yet, the one requirement in the pertinent regulation for Garden View in terminating housing to Fletcher is meeting the due process requirement. 24 C.F.R. §574.310(e)(2)(ii) (2007). However, Fletcher concedes that procedural due process is not an issue in this case and could not credibly do so given the court process. See *Fox*, 375 Ill. App. 3d at 46 (the trial judge, as the fact finder, is better suited than the reviewing court to assess credibility and weigh evidence). Thus, his reliance upon *Cotton v. Alexian Brothers Bonaventure House*, No. 02 C 7969 (N.D. Ill. September 9, 2003), is misplaced. The language in the regulation simply does not state that termination of assistance can only occur after supportive services are provided. To interpret the statute as Fletcher contends would render the first sentence in the regulation meaningless.

The parties' dispute then turns on the next phrase of "termination of assistance." Garden View asserts that the legislative history discussing termination of assistance is irrelevant in interpreting the statutory language at issue, because the language is clear on its face and the cited history pertains to another federal legislation known as the Shelter Care Plus Program, enacted under the McKinney-Vento Homeless Assistance Act (42 U.S.C. §11403 *et seq.* (2006)). The Shelter Care Plus program also provides funding for the housing needs of low-income recipients who are afflicted with AIDS and related diseases. 42 U.S.C. §11403 (2006). Thus, the legislative history is insightful.

The legislative history referenced indicates that a grantee has the discretion to exercise judgment when circumstances warrant terminating housing assistance to an individual who violates program requirements. See S. Rep. No. 101—316, at 172 (1990), *as reprinted in* 8 U.S.C.C.A.N. 5763, 5934. While Fletcher cites the legislative history noting relapse, he conveniently ignores the following comment indicating that local providers should not be forced to continue providing services to individuals who are unwilling to seek treatment for their problems. See S. Rep. No. 101—316, at 172 (1990), *as reprinted in* 8 U.S.C.C.A.N. 5763, 5934.

---

[7]In the Agreement, Garden View was to utilize HOPWA funds "to devise long-term comprehensive strategies for meeting the housing needs of persons with AIDS or related diseases and their families." The Agreement does not contain language obligating Garden View to also provide supportive services such as those described herein. Since CDPH could arrange for HOPWA funds to be used for supportive services independent of housing activity, Garden View could serve as a project sponsor solely rendering housing services with HOPWA funds received under the Agreement.

Moreover, the legislative history suggests that a termination of housing assistance is not conclusive, as local programs are encouraged to use reasonable efforts to intervene before terminating assistance and making attempts to bring the person back into the program where termination occurs. See S. Rep. No. 101—316, at 172 (1990), *as reprinted in* 8 U.S.C.C.A.N. 5763, 5934. Thus, Fletcher's termination of tenancy at Garden View does not mean that Fletcher is unable to avail himself of housing assistance at another facility receiving HOPWA funding.

The last phrase that Fletcher focuses on is whether the discovery of illegal drugs in his apartment constituted a "most severe case" warranting his housing termination at Garden View. Fletcher's argument equates "most severe" as the quantity of a violation as opposed to the nature of the violation. To narrow the interpretation to the former would render an absurd result in the legislation, which this court cannot do in interpreting statutory language. See *Alvarez v. Pappas*, 229 Ill. 2d 217, 228 (2008). Clearly, the federal government does not condone illegal drug activity in federally subsidized housing. See *Department of Housing & Urban Development v. Rucker*, 535 U.S. 125, 130, 134, 152 L. Ed. 2d 258, 266, 268-69, 122 S. Ct. 1230, 1233, 1235 (1990) (upholding lease term vesting public housing authorities with authority to evict tenants for known and unknown illegal drug-related activity in units). As the trial court noted at the end of the trial in reference to the *de minimis* argument:

"[If] I do that, then I have to say drugs are permissible even if the lease says no drugs. If a small amount is permissible, where do I draw the line?"

Thus, we cannot conclude that the statutory provision requires a certain amount of any illegal drug be found in the apartment before a lease termination is considered "the most severe case."

In the lease that Fletcher signed, he acknowledged he would not "permit, suffer or allow the Unit to contain illegal drugs." He also agreed to be responsible for the conduct of all persons visiting him in the apartment. Fletcher's interpretation would also have this court overlook the other language in the implementing regulations that housing may be terminated for violating conditions of occupancy. 24 C.F.R. §574.310(e)(i) (2007). As Fletcher's lease is the document outlining the conditions of his occupancy, the trial court properly viewed the lease in determining the grounds for terminating his lease.

Most importantly, Fletcher agreed in the lease that his failure to comply with the term prohibiting illegal drugs in the apartment

constituted a material noncompliance[8] with the lease and a basis for terminating the lease. Fletcher also references that the criminal complaint was dismissed against him. However, the lease agreement notes that proof of a lease violation is not dependent upon a criminal conviction and shall be established by a preponderance of the evidence. The record reflects that it is undisputed that the object found in Fletcher's apartment and later tested by a credible source was adjudged to contain marijuana—an illegal drug. As the trier of fact and assessor of credibility, the trial court also found that Fletcher admitted to consuming illegal drugs in the apartment. Hence, we conclude that the trial court's judgment finding a lease violation was not against the manifest weight of the evidence.

## II. Garden View's Adverse Examination of Fletcher

▮ Next, Fletcher claims the trial court erred in allowing Garden View to call him as an adverse witness in its case-in-chief without prior notice under Supreme Court Rules 213 and 237. 210 Ill. 2d R. 213; 166 Ill. 2d R. 237. Fletcher also argues a new trial is warranted, because Garden View's action violated an order regarding trial witnesses entered the day before trial. Garden View maintains that its adverse examination was permitted under the Illinois Code of Civil Procedure (Code) (735 ILCS 5/2—1102 (West 2002)) and denies that the examination violated the trial court's order at issue.

At trial, Fletcher's counsel objected when Garden View called him as a witness, asserting that Garden View failed to serve notice under Supreme Court Rule 237. See 166 Ill. 2d R. 237(b). It is undisputed that Garden View failed to serve a Rule 237 notice upon Fletcher. Rule 237 provides that "the appearance at the trial *** of a party may be required by serving the party with a notice designating the person who is required to appear." 166 Ill. 2d R. 237(b). As Fletcher was disclosed as a defense witness in his supplemental interrogatory answers served upon Garden View more than a few months before trial, Garden View may have felt that it was unnecessary to serve notice upon him to compel his appearance at trial. See *Pancoe v. Singh*, 376 Ill. App. 3d 900, 914 (2007). While Garden View certainly took a chance that Fletcher would appear, we do not believe that its failure to serve notice precluded Garden View's examination.

---

[8]The regulations define "material noncompliance" with a lease to include "one or more substantial violations of the lease." 24 C.F.R. §880.607(b)(3)(A) (2007). Hence, Fletcher's contention that the small amount of the illegal drugs discovered in the apartment on the sole occasion could not be deemed a material violation warranting lease termination is unfounded.

Additionally, Fletcher contends Garden View failed to disclose him as a witness in its interrogatory answers pursuant to Rule 213. 210 Ill. 2d R. 213. We review the trial court's admission of the testimony for an abuse of discretion. *Schultz v. Northeast Illinois Regional Commuter R.R. Corp.*, 201 Ill. 2d 260, 294 (2002); see *Pancoe*, 376 Ill. App. 3d at 913. "An abuse of discretion may be found only where no reasonable man would take the view adopted by the circuit court." *Pancoe*, 376 Ill. App. 3d at 913, quoting *Kim v. Mercedes-Benz, U.S.A., Inc.*, 353 Ill. App. 3d 444, 452 (2004). Of note, Fletcher's counsel did not state this as a basis for the objection at trial, but raises it in his brief on appeal. While parties should preserve their grounds for appeal by stating a specific objection, we will address the issue in the interests of justice and since the parties fully briefed the issue. See *Carpetland U.S.A., Inc. v. Illinois Department of Employment Security*, 201 Ill. 2d 351, 397 (2002).

In pertinent part, Rule 213(f) requires:

> "Upon written interrogatory, a party must furnish the identities and addresses of witnesses who will testify at trial and must provide the following information:
>
>> (1) *Lay Witnesses*. A 'lay witness' is a person giving only fact or lay opinion testimony." 210 Ill. 2d R. 213(f).

Garden View cites a case in support of its contention that Fletcher was not a witness in the "truest sense." As Fletcher's brief emphasizes, one of the reasons for Rule 213 was to eliminate surprise and tactical gamesmanship.

We disagree with Garden View. "Witness" is defined "[i]n general, [as] one who, being present, personally sees or perceives a thing" and "who testifies to what he has seen, heard, or otherwise observed." Black's Law Dictionary 826 (abr. 5th ed. 1983). Certainly, Fletcher, who was identified in his supplemental answers as prepared to testify about his detention at Garden View and the events occurring in his apartment resulting in the termination notice, qualified as a witness.

In naming an adverse witness, one does not know whether an individual will be called to testify as an adverse or hostile witness until trial. *Arians v. Larkin Bank*, 253 Ill. App. 3d 1037, 1046 (1993). In this case, however, Garden View certainly knew that Fletcher would be biased and had an adverse position prior to trial. Hence, we believe that Garden View should have disclosed Fletcher as an individual whom it intended to call as a witness in its case-in-chief.

Even if the trial court improperly allows an individual to testify as an adverse witness, reversal is warranted only where the objecting party suffers prejudice. *Arians*, 253 Ill. App. 3d at 1046. We consider the following factors in making that determination: surprise to the

adverse party; the prejudicial effect of the testimony; the nature of the testimony; the diligence of the adverse party; timeliness of the objection to the testimony; and the good faith of the party calling the witness. *Pancoe*, 376 Ill. App. 3d at 913, quoting *McGovern v. Kaneshiro*, 337 Ill. App. 3d 24, 37 (2003). Based upon the record, we conclude that Fletcher failed to suffer any undue harm or prejudice when the trial court allowed his testimony as an adverse witness mandating a new trial. See *Arians*, 253 Ill. App. 3d at 1047.

One, there may have been some surprise at the trial when Garden View's counsel called Fletcher to testify, but there should not have been given the litigation experience of the parties' counsel. Two, the testimony elicited from Fletcher was only prejudicial to the extent that Fletcher's answers during the examination failed to cast him in a favorable light. Three, the nature of his testimony was consistent with what his counsel disclosed he would testify about—the events that occurred in his apartment when Garden View's employee discovered apparent illegal drugs. Hence, his testimony did not reflect subject areas that he was unfamiliar with or should not have already been prepared to testify about when called as a witness on his own behalf. Four, as previously stated, Garden View failed to disclose Fletcher as a witness in its Rule 213 disclosures. However, for the reasons stated below, Garden View's failure is not dispositive. Five, Fletcher's counsel timely objected to the testimony, although she only objected on the grounds of an alleged violation under Rule 237. Six, Garden View appears to have acted in good faith. As previously discussed herein, Fletcher was disclosed as a defense witness in his supplemental interrogatory answers pursuant to Rule 213. Thus, Garden View may have felt it unnecessary to issue a separate notice as it was under the belief that he would already be present at the trial. In sum, while Fletcher's counsel may have been surprised by the litigation strategy to call Fletcher as an adverse witness in Garden View's case-in-chief, the totality of the circumstances in light of these factors does not warrant remanding the matter for a new trial.

Yet, our analysis does not end here as Fletcher further argues that Garden View's examination violated an order purportedly barring the parties from calling undisclosed witnesses at trial. On March 26, 2008, the day before the trial, the trial court entered an order stating that "Plaintiff and Defendant shall not call any undisclosed witnesses and not make any reference to the fact that this Order has been entered." An alleged violation of an *in limine* order will warrant a new trial where the order is specific, the violation is clear, and the violation deprived Fletcher of a fair trial. See *Kwon v. M.T.D. Products, Inc.*, 285 Ill. App. 3d 192, 198 (1996). Based upon the record presented, we cannot conclude that Garden View violated the order *in limine*.

First, the order is not specific about its prohibitions. We highlight that the order contains language crossed out which attempted to limit Garden View to calling specific individuals as witnesses and replaced with the language cited above. The record is devoid of any report of proceedings revealing the trial court's intent when it entered the order as part of over eight motions *in limine* Fletcher presented.

Second, Garden View's alleged violation is unclear. While Garden View insists that the order must be read and interpreted as referencing collective witnesses, with Fletcher being one of the disclosed witnesses, Fletcher interprets the order to mean that Garden View must have expressly disclosed Fletcher as a witness before trial. Since both interpretations are reasonable, we cannot say that Garden View's examination of Fletcher clearly violated the order.

Finally, we conclude that Fletcher was not deprived of a fair trial by the alleged violation. Among other things, defense counsel maintained that Garden View's failure to disclose him as a witness before trial "prevented Mr. Fletcher from constructing a fully informed defense." Although Fletcher and his defense counsel may not have anticipated he would testify earlier in the trial, defense counsel's preparation of the client in answering questions on cross-examination, akin to an adverse witness examination, negates any concern despite the unexpected examination. Hence, Garden View's action did not unduly prejudice Fletcher and the trial court did not abuse its discretion in allowing the testimony.

### III. Motion for Official Court Reporter Appointment

■ Lastly, Fletcher contends that the trial court erred in denying his motion for an official court reporter to transcribe the trial proceedings as he anticipated filing an appeal of the trial court's ruling. In addition to Fletcher's indigent status, Fletcher's counsel was acknowledged as a civil legal services provider. The Code provides for a waiver of costs and fees under these circumstances:

> "When a party is represented in a civil action by a civil legal services provider, all fees and costs relating to filing, appearing, transcripts on appeal, and service of process shall be waived." 735 ILCS 5/5—105.5(b) (West 2006).

The record indicates and Fletcher readily admits he was able to obtain the report of proceedings to file his appeal, without costs, and as ordered by the trial judge at the conclusion of the bench trial. However, Fletcher seeks to have this court, going forward, require the trial court to appoint the official court reporter to transcribe any future proceedings in his case. Fletcher goes further in seeking an interpretation that the relevant provision requires a trial court to appoint the official court reporter in transcribing proceedings to avoid a

"chilling effect" on similar indigent litigants in the future. Garden View misunderstands Fletcher's argument as he does not seek to shift the costs of obtaining transcripts onto Garden View (or a nonindigent litigant).

As previously stated, statutory intent is derived from the plain and unambiguous language in the statute. *Country Mutual*, 339 Ill. App. 3d at 81. The plain language of the provision imposes no express requirement that the court retain the official court reporter to transcribe proceedings to effect the legislative intent to provide assistance to indigent litigants. Fletcher fails to cite to any authority supporting the specific requirement. Accordingly, we are unpersuaded to impose that requisite upon courts and find that the trial court did not abuse its discretion by denying Fletcher's motion.[9]

## CONCLUSION

Based upon the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

O'BRIEN, P.J., and GALLAGHER, J., concur.

---

[9]In fact, a court reporter is unnecessary for presenting a report of proceedings as part of the record on appeal, since the parties could submit a bystander's report pursuant to Rule 323(c). 210 Ill. 2d R. 323(c).