# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *Bakes v. St. Alexius Medical Center*, 2011 IL App (1st) 101646

---

| | |
|---|---|
| Appellate Court Caption | ROBERT BAKES, Plaintiff-Appellant, v. ST. ALEXIUS MEDICAL CENTER, MATTHEW NOWIKOWSKI, Individually and as an Agent of St. Alexius Medical Center, JOHN WALSTAD, Individually and as an Agent of St. Alexius Medical Center, and INITIAL SECURITY, INC., Defendant-Appellant. |
| District & No. | First District, Fourth Division<br>Docket No. 1–10–1646 |
| Filed | June 23, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The appellate court affirmed the judgment for defendant hospital in an action for battery and negligence, since the battery instruction properly instructed the jury as to plaintiff's proper burden of proof, there was sufficient evidence to warrant a contributory negligence instruction, plaintiff's claim that the evidence supporting a battery was "uncontradicted" was inaccurate, and defendants' alleged violation of a motion *in limine* barring evidence that plaintiff sent anyone to the hospital to intimidate them after he arrived home did not warrant a mistrial. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 2005–L–011620; the Hon. James P. Flannery, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on Appeal

Stewart D. Stoller and Steven E. Garstki, both of Stoller & Garstki, of Chicago, for appellant.

Ruth V. Enright and Ryan C. Evans, both of Chicago, for appellee St. Alexius Medical Center.

Patrick R. Grady, of Law Offices of Wolf & Wolfe, Ltd., of Chicago, for appellees Matthew Nowikowski, John Walstad, and Initial Security, Inc.

Panel

PRESIDING JUSTICE LAVIN delivered the judgment of the court, with opinion.
Justices Pucinski and Sterba concurred in the judgment and opinion.

## OPINION

¶ 1    Plaintiff Robert Bakes, a heavily medicated, postsurgical patient who attempted to leave St. Alexius hospital against medical advice, claims that he was injured when security guards Matthew Nowikowski and John Walstad thwarted his exit. He responded by lashing out with his crutches. Ultimately, he settled in a wheelchair and waited for his wife to take him home. He sued for battery and the jury found in favor of the defendants. He appeals on a variety of issues, including the propriety of the burden of proof instruction regarding the tort of battery. We affirm.

¶ 2                                I. BACKGROUND

¶ 3    The relevant testimony of the various witnesses at trial pertinent to Bakes' appeal will be summarized below. Any additional facts as needed will be recited within the following analysis.

¶ 4    Bakes testified that his right knee was injured in a 2000 fall while descending a flight of stairs. He sought medical advice from Dr. Freedberg, who recommended a procedure to reconstruct the injured knee and to repair cartilage and ligament damage. The knee surgery was performed by Dr. Freedberg on July 17, 2000, at St. Alexius. Bakes testified that when he woke from the surgery, his knee and toes were in great pain. As to his toes, Bakes stated that the "nerves felt like they were popping," and he described it as "almost like a fireworks feeling." The pain persisted in his knee and toes over the next few days and was great enough such that Bakes did not wish to participate in any physical therapy. Bakes testified that throughout this time, his knee was heavily bandaged, his leg was set straight in an immobilizer and he required crutches to ambulate.

-2-

¶ 5     At around 5 p.m. on July 21, 2000, approximately four days after the surgery, Bakes was notified by nurse Tejal Patel of his imminent discharge and was presented with a choice of pain medication to take home. Bakes replied that he was upset and did not understand why he was being released. He then told the nurse that he was "going to go wait outside," and that he wished to immediately leave the hospital. Despite his condition, Bakes managed to get out of his bed and into the restroom, where he promptly fell. He was able to stand up and use his crutches to make his way out of his fourth-floor room and to the elevator, passing four nurses without incident. As Bakes took the elevator down to the first floor, he realized that nurse Carol Szafranksi was at his side, asking him to relax. Bakes felt certain he did not need to calm down. Upon reaching the first floor, he perambulated on crutches to the exit, which he said consisted of a revolving door and two adjoining standard doors. Bakes testified he pushed the right-side door open and partially stepped out, but as he was getting his crutches through the door, he was approached by security guards Nowikowski and Walstad. They positioned themselves so they hemmed Bakes in between themselves. They then asked Bakes where he was going.[1] Bakes answered he was going to go outside, to which the security guards responded, "No, you're not." Bakes nonetheless continued his egress and testified that one of the guards pulled the door shut and "slammed" it on his right foot, causing him to scream out in pain. Bakes then attempted to leave through the adjacent revolving door, where the security guards "grabbed the revolving door and slammed it" on his foot. The next thing Bakes remembered was sitting in a wheelchair near the exit, with nurse Patel offering him morphine for his pain. He refused this offer. Bakes next remembered waking up in his bed and being unaware as to how he arrived there. His wife arrived shortly thereafter, and after receiving discharge instruction from the nurses, he was taken home by his wife.

¶ 6     Bakes testified that he was unable to walk for over five weeks and that he had constant pain in his entire right leg and foot. Specifically, Bakes described his foot as hypersensitive. Although Bakes' knee and leg recovered over the passing months, the constant hypersensitivity in his foot did not change. Eventually, Bakes again consulted Dr. Freedberg, who ordered a variety of tests to be performed and ultimately recommended surgery on his foot. Bakes stated the surgery, which occurred in early 2002, relieved the "firework kind of display" in his toes but did not help with the hypersensitivity, which still persisted at the time of the underlying trial.

¶ 7     Matthew Nowikowski testified that on July 21, 2000, he was at St. Alexius working as a security guard under Initial Security. Although he was posted at St. Alexius, Nowikowski testified that Initial Security, and not St. Alexius, was completely responsible in instructing him how to conduct himself. He further testified that as a security guard, he acknowledged he did not have any police powers or any more of a right to arrest or stop an individual than the average citizen. Turning back to the day of the incident, Nowikowski stated he received a radio call requesting assistance regarding Bakes, whom he described as combative. When Nowikowski observed Bakes on the first floor, he saw that Bakes was on crutches and in

---

[1]Although Bakes identified Nowikowski and Walstad as the security guards at St. Alexius, he did not distinguish the two in his description of the events and generally referred to Nowikowski and Walstad collectively in their actions and statements.

street clothes, with a bandaged foot. Nowikowski differed with Bakes on the number of exit doors, testifying that there was one "handicapped" door and one revolving door. The handicapped door was operated by a push button, and when activated, the door remained open for a period of time.

¶ 8    As Bakes approached the revolving door, the nursing staff told Nowikowski that Bakes was not allowed to leave the hospital. Nowikowski indicated that there was no time to discuss the situation with the nurses so he quickly followed the given instructions. Nowikowski stepped in between Bakes and the door and told him, "I can't let you go." In stepping in front of Bakes, Nowikowski admitted he accidentally stepped on Bakes' foot, which caused a shout of pain. Bakes nevertheless moved through the door, striking Nowikowski in the shin with a crutch in the process. Nowikowski stated it may have been possible that he put his hands down or touched Bakes in order to prevent himself from being whacked again by the patient's crutch. Nowikowski then saw nurse Szafranski arrive with a wheelchair and Bakes, who was visibly fatigued, slumped down in the wheelchair.

¶ 9    John Walstad testified that he was employed by Initial Security in July 2000 and was working at St. Alexius along with Nowikowski. His testimony regarding the underlying incident was consistent with Nowikowski's testimony. Walstad testified that when he observed the patient near the revolving door, Walstad put his foot in front of the door to prevent it from turning. Walstad was presented with the incident report written by him on that day which indicated that "security *** confronted the patient at the handicap exit door," but Walstad testified that the entire incident took place near the revolving door and not by the handicap exit door. Walstad also stated that Bakes had struck him in the groin while attempting to leave, although Walstad never touched him until he later assisted Bakes into the wheelchair when it was brought by nurse Szafranski. Finally, Walstad indicated that although he was asked by the nursing staff to prevent Bakes from exiting, he did not have the time to inquire their reasoning. He further acknowledged that he was only to follow the instructions of his employer, Initial Security, and that the nursing staff does not actually give the security guards any orders.

¶ 10    Nurse Tejal Patel testified that on the afternoon of July 21, 2000, she was working at St. Alexius as a nurse on the orthopedic floor and that Bakes was one of her patients. Dr. O'Keefe had entered an order discharging Bakes, which nurse Patel was planning to effect later that afternoon. She first conducted an initial assessment of Bakes where he stated that he was relatively comfortable and did not then require pain medication. Based on her observations, nurse Patel determined that Bakes was ready to be discharged. She informed Bakes accordingly and provided a choice of pain medication to use at home, but Bakes became very upset upon hearing that he was to be discharged and started moving around and hyperventilating. Bakes also expressed that the offered pain medications were insufficient and stated, "These medications are not good enough. I thought I was supposed to be doped up." Nurse Patel observed that Bakes was behaving erratically and using his crutches improperly, which she believed could damage his knee and leg. She was concerned that Bakes was not listening to her discharge instructions and felt that he was not acting safely. She told Bakes that he could still stay in the hospital if he was not ready to leave, but he did not appear to be listening.

¶ 11    Nurse Patel offered to call Bakes' wife, but he responded that he did not want to wait and that he was just going to walk home. Nurse Patel told him she would call his wife because he could not simply walk out, due to his physical condition and his on-board medications, and that she would call his wife, friend, or a cab to take him home. Bakes angrily disregarded her, and during his attempt to leave, he insisted to nurse Patel that while he was in a lot of pain, he could acquire "better drugs outside." Nurse Patel also testified that Bakes threatened that "he was going to send his gang members to take care of [her] and [her] family."

¶ 12    Nurse Patel then notified her charge nurse and supervisor of the escalating situation and contacted Bakes' wife at that time, asking her to come to the hospital. When nurse Patel next saw Bakes, he was on the first floor being assisted into a wheelchair, and she offered him a dose of morphine for his pain which he refused. Upon being returned to his room, Bakes reiterated his previous threat to nurse Patel, and when his wife arrived shortly thereafter, he threatened to injure her as well. Nurse Patel related the discharge instructions to Bakes and his wife, and then Bakes was taken home.

¶ 13    Nurse Carol Szafranski testified that on the date of the incident, she was working at St. Alexius when she received a call from nurse Patel seeking assistance with Bakes. When she arrived at his room, she observed Bakes was "agitated, upset, walking around the room, throwing things down, [and] complaining about pain medication." As Bakes left his room, he continued to complain of his discomfort and pain, and also stated his intention to walk home, which was approximately 10 miles away. Nurse Szafranski followed him and saw that Bakes was putting weight on the leg that had been operated on and she was concerned he could reinjure or otherwise damage it. Although she tried to reason with Bakes and persuade him to not leave, he was unresponsive and did not appear to be listening to her. Nurse Szafranski accompanied Bakes as he went down the elevator, and upon arriving on the first floor, nurse Szafranski briefly left Bakes to retrieve a wheelchair.

¶ 14    When she returned, she saw Bakes near the exit with Nowikowski and Walstad standing by him. She directed the security guards to prevent Bakes from leaving because she was concerned by the fact Bakes was not properly taking care of his operative leg and was attempting to walk home. She did not see Nowikowski or Walstad touch Bakes at any time. She also admitted that Nowikowski and Walstad were not hospital employees and, while she could ask for their assistance, she had no direct control over them. When nurse Szafranski brought the wheelchair to Bakes, he sat down in it and she brought him back to his room. Bakes' wife arrived shortly thereafter; however, nurse Szafranski testified that Bakes continued to march around his room and yell. Bakes eventually calmed down, and after nurse Szafranski ensured that he would not be walking home, she deemed Bakes was no longer a danger to himself and discharged him under the care of his wife.

¶ 15    Dr. Yelena Tumashova provided medical expert opinion on behalf of St. Alexius. She testified that after a review of Bakes' medical records, she concluded that the persisting nerve condition in Bakes' foot was the result of the knee surgery rather than the result of any incident with the security guards. She further opined that numbness and pain in his foot could have been due to nerve dysfunction caused by the surgery or a cast that was too tight. All the medical records indicated to Dr. Tumashova that Bakes' issues in his right foot were present immediately after the surgery, prior to any incident with the security guards. She testified that

Bakes' nerve injury, discovered by an electromyography (EMG) examination, could not have been caused by someone simply stepping on his foot. Furthermore, the EMG study also suggested that, due to the location of the complaint, it would be extremely unlikely that the nerve injury was caused by his leg becoming jammed in a door. Dr. Tumashova also noted a lack of scar tissue and the absence of damage to any adjacent nerves and thus concluded that there was no evidence that a physical impact had caused physical damage to the nerve. Finally, she testified that Bakes could have injured his foot by walking inappropriately during his recovery, as the foot was vulnerable from surgery and bearing weight on it could compromise the foot's blood supply and nerves.

¶ 16    After the trial, the jury returned a verdict in favor of all defendants and against Bakes. Bakes filed this timely appeal.

¶ 17                                II. ANALYSIS

¶ 18                            A. Battery Instruction

¶ 19    Bakes' overarching contention on appeal is that the trial court's jury instruction on battery misstated the law and was therefore erroneous. It is within the trial court's considerable discretion to give or deny a jury instruction. *Bulger v. Chicago Transit Authority*, 345 Ill. App. 3d 103, 121 (2003). In determining whether this discretion was abused, we will consider the instructions in their entirety and determine whether the jury was fairly, fully, and comprehensively informed as to the relevant legal principles. *Id.* at 122. Even where a trial court has given faulty instructions, a reviewing court ordinarily will not reverse unless the instructions clearly misled the jury and resulted in serious prejudice to the appellant. *Schultz v. Northeast Illinois Regional Commuter R.R. Corp.*, 201 Ill. 2d 260, 274 (2002); *Bulger*, 345 Ill. App. 3d at 121.

¶ 20    We begin with the lamentable fact that there is no Illinois Pattern Jury Instruction on the tort of battery.[2] As a result, the parties were left to draft instructions that purported to comport with the existing Illinois case law on battery. Unsurprisingly, the instructions offered by each side at trial were at odds with each other. Bakes offered the following jury instruction, in pertinent part:

"The Plaintiff has the burden of proving each of the following propositions:

　　1. That the Defendant intended to touch the Plaintiff's body, and

　　2. That the Defendant actually touched the Plaintiff's body, and

　　3. That said touching was harmful or offensive, and

　　4. That said contact directly or indirectly caused an injury to Plaintiff."

---

[2]While there are a number of Illinois Pattern Jury Instructions pertaining specifically to medical battery (see Illinois Pattern Jury Instructions, Civil, Nos. 105.05 through 105.07 (2006)), the Illinois Pattern Jury Instructions lack any similar guidance for other, nonmedical batteries such as the one alleged by Bakes in the instant case.

-6-

Defendants' jury instruction, in pertinent part, read:

"[Plaintiff] has the burden of proving ***:

1. That the defendant had the intent to cause a harmful or offensive contact with plaintiff.

2. That the defendant actually made unauthorized physical contact with plaintiff that was harmful.

3. That plaintiff was injured.

4. That defendant's action caused the injury to plaintiff."

The learned judge below, after hearing argument from both parties, submitted defendants' jury instruction to the jury over Bakes' objection. Bakes takes issue only with the first element, which touches on the nature of the proof required regarding the intent of defendant. He argues that the trial court erred in instructing the jury that civil battery requires Bakes to prove that defendants intended to touch him in a harmful or offensive manner, as opposed to simply intending to touch him.

¶ 21 We should first acknowledge that there exists a dichotomy within the intent requirement for the tort of battery, *i.e.*, whether intent equates to an intent to harm or offend, or merely an intent to touch. This dichotomy among various jurisdictions has been the subject of vigorous academic debate as reflected in various law review articles. See, *e.g.*, Kenneth W. Simmons, *A Restatement (Third) of Intentional Torts?*, 48 Ariz. L. Rev. 1061 (2006); Craig M. Lawson, *The Puzzle of Intended Harm in the Tort of a Battery*, 74 Temp. L. Rev. 355 (2001). The parties here expend considerable effort in arguing that the opponent's jury instruction is simply not an accurate statement of law in Illinois. Both parties, however, miss the mark. As we will discuss, Illinois courts have defined the tort of battery in multiple ways, and arguably, have characterized the element of intent in ways that comport to both parties' proffered jury instruction. Ironically enough, some might even persuasively argue the trial court could have given either tendered instruction and found sufficient precedential comfort from our supreme court and the several appellate court districts in Illinois.

¶ 22 Our dissection of the relevant law on this ancient but somewhat arcane tort begins with the Restatement (Second) of Torts, which provides that battery is committed by an individual if: "(a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) a harmful contact with the person of the other directly or indirectly results." Restatement (Second) of Torts § 13 (1965). From this, we have stated that " 'the wilful touching of the person of another or a successful attempt to commit violence on the person of another' " constitutes battery. *Britamco Underwriters, Inc. v. J.O.C. Enterprises, Inc.*, 252 Ill. App. 3d 96, 101 (1993) (quoting *Parrish v. Donahue*, 110 Ill. App. 3d 1081, 1083 (1982)). We have also stated that battery involves contact by a defendant that is unauthorized (*Boyd v. City of Chicago*, 378 Ill. App. 3d 57, 69 (2007)), where defendant has done some affirmative act intended to cause the unpermitted contact (see *McNeil v. Carter*, 318 Ill. App. 3d 939, 944 (2001); *Gaskin v. Goldwasser*, 166 Ill. App. 3d 996, 1012-13 (1988)). Most notably, however, we have also stated that battery requires more than an intent to contact, in that a defendant must intend to cause a harmful or offensive contact. See *Happel v. Wal-Mart Stores, Inc.*, 316 Ill. App. 3d

621, 630 (2000); *Welch v. Ro-Mark, Inc.*, 79 Ill. App. 3d 652, 658 (1979).

¶ 23    Accordingly, we find legal support as to both whether the intent element of battery requires intent to touch, or the arguably more difficult-to-prove intent to cause a harmful or offensive contact. This provides us a sufficient basis upon which to affirm the jury's verdict based upon the instruction in question, since the instruction supplied an acceptable burden of proof of battery based on extant Illinois case law. Furthermore, the instruction could also easily be interpreted to mean that defendant must only intend to cause a contact, with that contact ultimately being harmful or offensive. This would conform to plaintiff's proposed intent requirement. We recognize, however, the variance in definition here, so the relevant question before us is perhaps not which party's jury instruction is correct *per se*, but rather which jury instruction is appropriate to properly frame the issues under the facts of this specific case. We find that the tendered instruction was quite appropriate under these specific facts.

¶ 24    Generally, it is fair to state that cases holding that one need not prove intent to harm or offend in a battery action generally fall within the ambit of a medical battery or so-called "helpful intent" cases. See, *e.g.*, *In re Estate of Allen*, 365 Ill. App. 3d 378, 385 (2006); *Lane v. Anderson*, 345 Ill. App. 3d 256, 261 (2004); *Curtis v. Jaskey*, 326 Ill. App. 3d 90, 93 (2001). In this narrow legal milieu, it is axiomatic that defendant lacked any intent to harm or offend, yet they are nonetheless considered batteries. See *Lawson*, 74 Temp. L. Rev. at 358. Accordingly, medical battery and other similar helpful intent cases logically direct their focus upon the lack of consent; in other words, whether the touch was intended, but still unauthorized. It merits mention here that Bakes' proposed jury instruction was devoid of any reference to consent and did not specifically require that the defendants' contact be unauthorized.

¶ 25    In any event, as previously stated, Bakes argues that the intent in this case should simply have required proof of an intent to touch. We acknowledge the logic in using such a standard in helpful intent cases, such as medical battery. If this standard, however, were to be used across all factual scenarios outside so-called helpful intent cases, our holding could be construed that any of the intentional contacts that might occur in one's daily life, no matter how benign, could be considered a battery should the contact inadvertently be offensive. See *Lawson*, 74 Temp. L. Rev. at 363. Such a broad generalization would provide nothing but a disservice to litigants in battery actions.

¶ 26    Examination of the aforementioned law review articles and the numerous cases decided in Illinois proves to us that coming to a one-size-fits-all definition of civil battery is not only difficult, it may well be a fool's errand, as it may suffice in some cases, yet be misleading and inappropriate in others. The pleading and proof at trial in this matter suggest that the jury was properly instructed. In his complaint, Bakes based his claim for battery on allegations that Nowikowski and Walstad "sandwiched" Bakes between their bodies and "twice slammed a door" on Bakes' foot to prevent him from leaving the hospital. Indeed, those were the only factual theories Bakes presented at trial. We note that the threshold for what constitutes an "offensive" touching is low, and we have stated it occurs when the contact " 'offends a reasonable sense of personal dignity.' " *Cohen v. Smith*, 269 Ill. App. 3d 1087, 1090 (1995) (quoting Restatement (Second) of Torts § 19 (1965)).

¶ 27     Given this, if either of Bakes' versions of events were accepted by the jury, at the very least, an offensive touching would have occurred that would have satisfied the intent element of both sides' definition of civil battery. On the other hand, the theory advanced by defendants, that any contact was purely accidental, could not have constituted a battery under any definition of battery. Accordingly, given the underlying complaint and evidence at trial, we find that the jury instruction given at trial properly instructed the jury as to plaintiff's proper burden of proof. Parenthetically, we should note that we would not reverse here even if the intent element of the battery instruction was faulty in the way Bakes claims it was, because under the factual circumstances of the case advanced by Bakes, the instruction could not have resulted in any prejudice to him such that he would have been deprived of a fair trial. See *Schultz*, 201 Ill. 2d at 274.

¶ 28                          B. Contributory Negligence Instruction

¶ 29     Bakes next contends that the jury instruction on contributory negligence was given erroneously. More specifically, he argues that any affirmative defense based on contributory negligence was irrelevant to the issues of whether he was "sandwiched" by the security guards, his foot was stepped on or jammed in a door, or whether he was free to leave the hospital. As discussed above in our battery analysis, it is within the trial court's discretion to give or deny a jury instruction. *Bulger*, 345 Ill. App. 3d at 121. The trial court has discretion to review the evidence presented and decide whether that evidence raised an issue which requires a particular jury instruction. *Stapleton v. Moore*, 403 Ill. App. 3d 147, 163 (2010). A jury instruction on contributory negligence here is proper if the trial court finds that there is some evidence in the record that will justify the theory of the instruction, which is distinct from the heightened standard of testing whether the evidence is sufficient to persuade the jury. *LaFever v. Kemlite Co.*, 185 Ill. 2d 380, 406 (1998). Maintaining the necessary and appropriate deference to the trial court, we will not reweigh the evidence or decide whether a particular result was unwarranted, and we will find that the evidence upon which a particular jury instruction was proffered to be sufficient even though it may be insubstantial. *Id.* (citing *Leonardi v. Loyola University of Chicago*, 168 Ill. 2d 83, 100 (1995)). Instructions respecting contributory negligence should be given with reference to the particular circumstances of the case and will be found improper where there are no facts presented from which a finding of contributory negligence could be reached. *Cooper v. Chicago Transit Authority*, 153 Ill. App. 3d 511, 521 (1987).

¶ 30     Bakes does not challenge the form of the instructions or whether they inaccurately state Illinois law on this subject but, rather, contends that the instructions were improper because there is no evidence or testimony that he caused his own injuries. Because Bakes only challenges the propriety of the instruction, we only need to assess whether there was some evidence, even if slight, to justify the trial court's decision to instruct the jury. Here, there is evidence that Bakes had been combative, abusive, and moderately irrational prior to the altercation at issue. Testimony by various witnesses indicated that Bakes refused to follow medical instructions to keep weight off of his previously injured leg. In sum, despite being warned that he could potentially reinjure or damage his leg, Bakes angrily marched around his room, traveled without assistance from the fourth floor to the first floor, did not accept

care instructions that were given to him, ignored requests to stay in the hospital, refused to wait for a ride home, and indicated that he was attempting to walk 10 miles back to his house, all while using his crutches improperly and putting weight on his postoperative leg. Medical expert testimony also suggested that if Bakes attempted to walk dependently on his postoperative leg, Bakes could have injured his foot as it was vulnerable from his surgery, and bearing weight on it could compromise blood supply and the nerves in the foot. Therefore, it is clear that evidence was in fact presented to the trial court that Bakes' actions not only could have contributed to the particular circumstance in which Bakes alleges the defendants were negligent, but also that he could have negligently contributed to the actual injury of his foot. Accordingly, the trial court did not abuse its discretion in deciding that sufficient evidence existed to warrant a contributory negligence jury instruction.

¶ 31                      C. Judgment Notwithstanding the Verdict

¶ 32        Bakes next contends that the trial court erred by denying plaintiff's motion for judgment notwithstanding the verdict. The trial court's decision on a motion for judgment notwithstanding the verdict is reviewed *de novo*. *Snelson v. Kamm*, 204 Ill. 2d 1, 42 (2003). Judgments notwithstanding the verdict should only be entered in cases in which all the evidence, when viewed in the aspect most favorable to the nonmovant, so overwhelmingly favors the movant that no contrary verdict based on the evidence could ever stand. *Pavnica v. Veguilla*, 401 Ill. App. 3d 731, 738 (2010). The court does not weigh the evidence or make determinations of credibility when ruling on motions for judgments notwithstanding the verdict, and must not substitute its judgment for that of the jury merely because there are other inferences or conclusions that the jury could have drawn or because there are other results that the court believes is more reasonable. *Thornton v. Garcini*, 382 Ill. App. 3d 813, 817 (2008).

¶ 33        Bakes argues that the trial court should have granted his motion for a judgment notwithstanding the verdict because the "uncontradicted evidence" shows that security guards Nowikowski and Walstad "battered Mr. Bakes, and in fact caused injury to him." Bakes' claim that the evidence supporting a battery had occurred was "uncontradicted" is wholly inaccurate. Even a cursory review of the record indicates that the evidence of whether any offensive touching occurred was an issue that was in great dispute at trial. For example, Bakes argues on appeal that Nowikowski flatly admitted he stepped on Bakes' foot, implying intent existed. A review of the record, however, indicates that Nowikowski testified that he "accidentally" stepped on Bakes' foot while attempting to maneuver around Bakes. Bakes' assertion that Nowikowski and Walstad "sandwiched" Bakes, thereby intending to touch him, is also contradicted by the record as both Nowikowski and Walstad deny sandwiching Bakes with any intent to touch him. Bakes also argues that the security guards slammed the doors on his foot; however, he simply points to his own testimony in support and has failed to recognize that his version of the incident was heavily disputed at trial. Bakes further states that it was uncontradicted that he was "manhandled" without his consent, but the only support for this in the record is his own testimony which was contradicted by testimony from Nowikowski, Walstad, and nurse Szafranski. In fact, Nowikowski testified that the only instance where he might have touched Bakes was when he "may have put [his] hands down

on him" to defend himself after Bakes struck Nowikowski's shin with a crutch. Walstad also testified that the only time he may have touched Bakes was when he was assisting him into a wheelchair nurse Szafranski had retrieved. Neither of these instances, however, served as the basis for Bakes' battery claim. Given this, we cannot say that the evidence was "uncontradicted," let alone that it so overwhelmingly favored Bakes that the jury's verdict could not stand. Accordingly, the trial court did not err in denying Bakes' motion for judgment notwithstanding the verdict on his battery claim.

¶ 34     To the extent Bakes claims on appeal that the trial court should have granted his motion for judgment notwithstanding the verdict on any negligence claim, we find such arguments to be forfeited. Bakes' posttrial motion only moved for "judgment notwithstanding the verdict on the issue of battery," and singularly asserted that "no contrary verdict on the issue of battery could ever stand." No argument related to any negligence claim for a judgment notwithstanding the verdict was advanced. Illinois Supreme Court Rule 366(b)(2)(iii) provides that a "party may not urge as error on review of the ruling on the party's post-trial motion any point, ground, or relief not specified in the motion." Ill. S. Ct. R. 366(b)(2)(iii) (eff. Feb. 1, 1994); see also *Brown v. Decatur Memorial Hospital*, 83 Ill. 2d 344, 349 (1980) (contentions must be presented with specificity in a posttrial motion to preserve them for review). Even if we were to overlook this procedural forfeiture, our review of the record indicates that the evidence regarding negligence was as much in dispute as the previously discussed evidence of battery, and thus we decline to grant Bakes any relief on this basis.

¶ 35          D. Motion for a New Trial–Manifest Weight of the Evidence

¶ 36     Bakes next argues that the trial court erred in denying his motion for a new trial. On a motion for a new trial, a trial court will weigh the evidence and can set aside the verdict and order a new trial if the verdict is contrary to the manifest weight of the evidence. *Ford v. Grizzle*, 398 Ill. App. 3d 639, 651 (2010). A verdict is against the manifest weight of the evidence "where the opposite conclusion is clearly evident or where the findings of the jury are unreasonable, arbitrary and not based upon any of the evidence." (Internal quotation marks omitted.) *Maple v. Gustafson*, 151 Ill. 2d 445, 454 (1992). A trial court's ruling on a motion for a new trial will not be disturbed unless the party seeking a new trial can show that the trial court clearly abused its discretion. *Anderson v. Zamir*, 402 Ill. App. 3d 362, 364 (2010). In determining whether an abuse of discretion occurred, we must consider whether the jury's verdict was supported by the evidence and whether the complaining party was denied a fair trial. *Maple*, 151 Ill. 2d at 455. Bakes first argues that the verdict was against the manifest weight of the evidence. We note that under this basis, Bakes has confined his argument to the actions of Nowikowski and Walstad and has not challenged the jury's verdict as it relates to St. Alexius or any of its employees in his posttrial motion or on appeal.

¶ 37     Again, Bakes asserts that the "uncontradicted" and "uncontroverted" evidence shows that Nowikowski and Walstad committed battery against Bakes and negligently stepped on his foot, causing injury. As discussed above, however, the evidence relevant to Bakes' battery and negligence claim was controverted in a very thorough manner at trial. Moreover, we disagree with Bakes' assertion that there was no evidence to support the jury's verdict. We

-11-

acknowledge Bakes' own assertions that he was not a danger to himself, was improperly detained, was touched against his will, was "sandwiched" by Nowikowski and Walstad, had his foot slammed in a door (or as now alternatively argued, stepped on), and that the nerve damage and permanent damage to his foot were caused by the incident. All of these assertions, however, were disputed at trial: The nurses testified they believed Bakes was a danger to himself due to his actions evidencing a disregard for his own care and well-being, Nowikowski and Walstad deny improperly touching or "sandwiching" Bakes, and although Nowikowski admitted he accidentally stepped on Bakes' foot, Dr. Tumashova provided uncontradicted testimony that Bakes' lasting foot injuries were nevertheless caused by postoperative complications as opposed to the foot being stepped on or jammed in a door. Dr. Tumashova further testified that it was possible that his injuries resulted from improper postoperative self-care and, as discussed above, there was evidence offered that Bakes could have negligently contributed to his own injury in refusing to follow medical instructions and failing to exercise ordinary care for his own safety.

¶ 38    Essentially, the trial involved Bakes offering an uncorroborated version of events which was contradicted by the remaining witnesses' versions of the events. This case, therefore, largely involved determinations of credibility and resolutions of conflicts in testimony, and it is well established that such determinations and resolutions are for the jury. *York v. Rush-Presbyterian-St. Luke's Medical Center*, 222 Ill. 2d 147, 179 (2006). Because of this, it is not our duty to reweigh the evidence or make our own credibility determinations. Rather, the only question before us is whether the jury's verdict was supported by the evidence. Our examination of the record reveals there was indeed sufficient evidence presented such that the jury could find that no battery or negligence had occurred here. For example, based on the testimony at trial, the jury could very well have found that there was no offensive touching of Bakes and that the injury to his foot was not caused by the security guards, and thus no battery or negligent conduct as alleged by Bakes had occurred. Accordingly, the jury's verdict as to Nowikowski and Walstad was not against the manifest weight of the evidence and the trial court did not err in denying Bakes' motion for a new trial.

¶ 39            E. Motion for a New Trial–Violation of the Motion *in Limine*

¶ 40    Bakes next argues that he is entitled to a new trial because he was prejudiced by defendants' violation of a motion *in limine*. A violation of a motion *in limine* is not *per se* reversible error. *Jones v. Chicago Osteopathic Hospital*, 316 Ill. App. 3d 1121, 1132 (2000). Any alleged violation of a motion *in limine* here will warrant a new trial only where the order is specific, the violation is clear, and the violation deprived Bakes of a fair trial. *Garden View, LLC v. Fletcher*, 394 Ill. App. 3d 577, 589 (2009).

¶ 41    Prior to trial, Bakes filed a motion *in limine*. The motion, in pertinent part, requested the following:

> "10. The defendants and their attorneys should be barred from suggesting, implying or insinuating that the plaintiff sent anyone to the hospital to intimidate them after he arrived home, or nicknames or descriptions of such persons. The testimony from the nurse Szafranski is that a big gentleman arrived after Mr. Bakes

was home, and was looking for the security guard. She testified a 'very big physically appearance-wise threatening man who spoke very politely and nice to me that he was there to talk to the guard who stepped on Mr. Bakes' foot. He was very polite, but he also was very clear that he was there on a mission. I told him he could not see the security guard and if he had no business here, he would have to leave which he did.' *** There is no evidence that Mr. Bakes sent anyone to see the security guard. Any testimony about this person is irrelevant. The hospital and its security guards had already stopped and detained Mr. Bakes against his will, they had already injured him, and thereafter they had released him. This person is therefore irrelevant to any issues in this case, because his later presence did not make it any more or less likely that the aforesaid events occurred. Further, nurse Szafranski's only evidence that this man was threatening is that he was big. Other than that, he was 'very polite,' and he left when asked."

The trial court granted the motion *in limine*. At trial, counsel for St. Alexius displayed two-foot by three-foot "blow-ups" of certain medical records and progress notes at some point during nurse Patel's testimony. One of several handwritten entries on a displayed progress note provided the following:

"7/21/00 a Tall male arrived to the unit with a female. Stated he's here to p/u pt's belongings. Gave him ace wrap icing, tape, ice bag for Ice Man Machine and Immobilizer. He then asked for security office. Told him where it is located. Security office informed of this man's appearence [*sic*]."

During nurse Patel's testimony, a sidebar occurred where Bakes' counsel objected to the display of the progress note and moved for a mistrial. After a discussion between the parties and the trial court, the trial court held that a violation of the motion *in limine* had indeed occurred and ordered the display to be removed, but denied Bakes' motion for a mistrial, stating that the violation did not sufficiently prejudice Bakes such that he was deprived of a fair trial.

¶ 42        Bakes argues on appeal that the "violation was made for the purpose of inflaming and prejudicing the jury," and that it was "a direct attack on Plaintiff's character and veracity." Bakes also mentions that a note was sent to the trial court during jury deliberations which requested a copy of the progress note. We are unpersuaded by Bakes' argument. The evidence here constituted a progress note that was enlarged and placed before the jury, which nurse Patel read from. The entry that Bakes alleges violated the motion *in limine*, however, was never actually read to the jury or otherwise referred to. Furthermore, despite the fact the jury requested a copy of the progress note during deliberations, that by itself does not make it clear to this court that the jury read the entry at issue at all. Assuming a violation had nevertheless occurred, however, properly elicited testimony from nurse Patel had already indicated that Bakes had made a number of threats, twice threatening nurse Patel to the effect that "he was going to send his gang members to take care of [her] and [her] family," and that Bakes had stated, "He stepped on my foot, I know people, I'm going to take care of this." This testimony, which was deemed relevant and properly admitted, is far more damaging than anything contained in a progress note entry that was not read aloud and may or may not have been read by the jury. Essentially, other evidence relating the same information, which

was of at least equally damaging value, was already properly before the jury. We therefore find that no prejudice had occurred in the display of the entry and that Bakes was not deprived of a fair trial. Accordingly, we find that Bakes' motion for a mistrial was properly denied.

¶ 43                                   III. CONCLUSION

¶ 44        For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

¶ 45        Affirmed.