In the

# United States Court of Appeals

### For the Seventh Circuit

No. 12-1107

ALYCE COUCH, independent administrator of
the estate of Billy Couch, deceased,

*Plaintiff-Appellant*,

*v.*

UNITED STATES OF AMERICA,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:11-cv-02536—**George M. Marovich**, *Judge.*

ARGUED JUNE 7, 2012—DECIDED SEPTEMBER 5, 2012

Before MANION, KANNE, and HAMILTON, *Circuit Judges.*

HAMILTON, *Circuit Judge.* This case presents a recurring issue under the Federal Tort Claims Act and Illinois law, and one that has divided federal district courts in Illinois. The question is whether a driver employed by a private trucking company with a "Highway Contract Route" or "HCR" contract with the U.S. Postal Service is also a "borrowed employee" of the Postal Service for

purposes of the Federal Tort Claims Act and the Illinois Workers Compensation Act (IWCA). We conclude that the answer is no. The private trucking company does not merely "lend employees" to the Postal Service but provides mail transportation and delivery services. The company trains, equips, pays, and supervises its own employees using its own equipment to provide these services. We therefore reverse the district court's grant of judgment for the government in this case. Our decision is consistent with decisions in many cases in which injured persons have sued the Postal Service for injuries caused by the negligence of HCR drivers. In those cases the Postal Service has successfully argued that the HCR drivers are independent contractors rather than borrowed employees for whose negligence the Postal Service could be held liable.

I.  *Factual and Procedural Background*

The relevant facts are undisputed. In 2008, Billy Couch was employed as a truck driver by B&B Trucking, a private company that has HCR contracts with the Postal Service. While Couch was making a delivery to a Postal Service facility in Elk Grove, Illinois, a U.S. Postal Service employee ran over his foot with a forklift. Two years later, Couch died, allegedly as a result of complications from the injury. For purposes of this appeal, we must assume that the Postal Service employee was negligent and that the negligence caused Couch's injury and later death.

B&B Trucking provided its drivers with workers' compensation insurance, which covered Couch's medical

expenses. After her husband died, plaintiff Alyce Couch brought this action against the United States under the Federal Tort Claims Act (FTCA), which provides a cause of action for personal injuries negligently caused by federal employees acting within the scope of their employment. 28 U.S.C. § 1346(b)(1). Under the FTCA, the United States is liable to the same extent as a private entity under the law of the state where the allegedly tortious act occurred — in this case, Illinois. 28 U.S.C. § 2674.

Without addressing the merits, the United States moved for summary judgment on the theory that Couch was a "borrowed employee" whom the Postal Service had borrowed from B&B Trucking. If he was a borrowed employee of the Postal Service, then workers' compensation would provide Couch's only remedy against both the borrowing and lending employers, and the tort case would have to be dismissed. For reasons we detail below, the borrowed employee question here turns on the nature and terms of the HCR contract between the Postal Service and B&B Trucking.

Through HCR contracts, the Postal Service has outsourced to private companies certain mail delivery services that were once performed by its own employees. B&B Trucking is one such HCR contractor. B&B Trucking also works for FedEx and other private carriers, but it derives at least 90 percent of its revenue from its contracts with the Postal Service.

B&B Trucking owns its own delivery trucks for local, regional, and long-haul mail transportation. It also

screens, hires, trains, supervises, and pays its own drivers to transport mail between Postal Service facilities. B&B Trucking also employs dispatchers, custodians, mechanics, and administrative staff, but the vast majority of its 275 employees are drivers. Under an HCR contract, B&B Trucking drivers need not wear uniforms, but they must display a badge that identifies them as a "Non Postal Service Contractor Employee." The Postal Service does not train or manage the contractor employees in any way, but it does conduct background checks, and the HCR contract bars B&B Trucking from employing "any individual who . . . lack[s] sufficient ability to perform properly the required duties, [is] not a reliable and trustworthy person of good moral character," or is "barred by law or Postal Service regulations from performing such duties." B&B Trucking conducts a two- to three-day mandatory general training program for its drivers. Drivers communicate via their onboard truck computers with B&B Trucking's dispatcher, who in turn radios the Postal Service when necessary. The Postal Service requires contractor drivers to have cell phones in case the Postal Service or the driver needs to "initiate two-way communications" directly.

When bidding for an HCR contract, B&B Trucking provides an estimate of the number of employees it would require and the associated costs of the transportation services. Once the contract is performed, the Postal Service reimburses B&B Trucking for those costs. The contract at issue in this case was labeled one "For mail service," with the "type of service" described as "Trans-

portation." The contract did not specify the number of B&B Trucking drivers required to perform, only the number and types of vehicles. About 60 percent of the estimated cost was allocated to wages and employee benefits. These labor costs included a line-item estimate for workers' compensation insurance, which B&B Trucking purchased and for which the Postal Service reimbursed it.

As required under the IWCA, B&B Trucking's workers' compensation insurance paid Couch's medical bills. After Couch died, his widow filed this action against the United States for negligence, seeking damages that included pain and suffering, lost wages, and loss of consortium. After answering, the United States moved for summary judgment on the ground that workers' compensation provided the exclusive remedy available for the decedent's on-the-job injuries because the Postal Service was his borrowing employer for the purposes of the IWCA.

The district court relied on our decisions in *Luna v. United States*, 454 F.3d 631 (7th Cir. 2006), and *Belluomini v. United States*, 64 F.3d 299 (7th Cir. 1995), and framed the key issue as follows: whether the Postal Service was a borrowing employer depended on whether B&B was a "loaning employer" under the IWCA, and that question turned on whether "a substantial part of" B&B's "business is . . . furnishing employees to do jobs for governmental and private" employers. *Couch v. United States*, No. 11 C 2536, 2011 WL 6318943, at *4-5 (N.D. Ill. Dec. 14, 2011). The district court said yes, reasoning that because its drivers perform work typically done by the Postal

Service itself (namely, delivering mail), B&B Trucking "furnished" its employees to do the work of the Postal Service and other employers. The district court acknowledged its disagreement with *Jorden v. United States*, Nos. 09 C 6814 & 10 C 3144, 2011 WL 4808165 (N.D. Ill. Oct. 11, 2011), a parallel case in which Judge Feinerman concluded that the United States was not a borrowing employer under the IWCA because HCR contractors provide mail delivery *services* rather than lend employees for the Postal Service's use. This appeal followed.

II. *Discussion*

We review the entry of summary judgment *de novo*, construing all facts and drawing all inferences in the light reasonably most favorable to the non-moving party, who in this case is Mrs. Couch. See *Miller v. Herman*, 600 F.3d 726, 733 (7th Cir. 2010). Summary judgment is appropriate where the evidence before the court indicates "that there is no genuine issue as to any material fact" and that the moving party is entitled to judgment as a matter of law. *Id.*; see Fed. R. Civ. P. 56(c).

A. *The Federal Tort Claims Act and Workers' Compensation*

The FTCA is a limited waiver of the United States' sovereign immunity. *Dolan v. U.S. Postal Service*, 546 U.S. 481, 484 (2006). It is the exclusive remedy for any tort claim resulting from the negligence of a government employee acting within the scope of employment. See 28 U.S.C. § 2679(b)(1). The key provision of the FTCA

specifies that "the United States shall be liable . . . to tort claims in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674; *United States v. Muniz*, 374 U.S. 150, 153 (1963). In Illinois, where the Postal Service's alleged negligence occurred, "the IWCA is the exclusive remedy for workers injured on the job; covered employers cannot be sued for accidental workplace injuries." *Luna*, 454 F.3d at 634. This rule reflects the policy trade-off at the heart of workers' compensation: employees recover modest compensation for workplace injuries regardless of fault; employers are spared the risk of larger damages verdicts; and the costs of litigation should be reduced. See Lawrence M. Friedman & Jack Ladinsky, *Social Change and the Law of Industrial Accidents*, 67 Colum. L. Rev. 50, 69-72 (1967).

The IWCA addresses the possibility that an employee might have more than one employer, such as when an employment agency or staffing service hires employees and then contracts with other companies who need temporary workers. When a covered employer "borrows" such an employee from a covered "loaning" employer and the employee is injured, both employers are responsible for providing workers' compensation benefits. 820 ILCS 305/1(a)(4). Absent a contrary agreement, the borrowing and lending employers are jointly and severally liable to the injured employee, *id.*, but as between the two, the borrowing employer is primarily liable and the loaning employer is secondarily liable. *Chicago's Finest Workers Co. v. Indus. Comm'n*, 335 N.E.2d 434, 437 (Ill. 1975). In such cases of borrowed employees, both employ-

ers enjoy immunity from tort liability. See *Luna*, 454 F.3d at 634; *Belluomini*, 64 F.3d at 302, citing *O'Loughlin v. ServiceMaster Co.*, 576 N.E.2d 196, 201 (Ill. App. 1991). Whether an injured worker is a borrowed employee is "generally a question of fact," *A. J. Johnson Paving Co. v. Indus. Comm'n*, 412 N.E.2d 477, 481 (Ill. 1980), but "when the unrebutted evidence is capable of only one interpretation," a court "must make the determination as a matter of law." *Kawaguchi v. Gainer*, 835 N.E.2d 435, 445 (Ill. App. 2005).

### B. *Borrowed Employment under the IWCA*

#### 1. *The Common Law "Control" Test*

Drawing on decisions of the Illinois courts, this court has articulated two separate tests for identifying a borrowed employment relationship for purposes of the IWCA. One test is based on common law principles of the borrowed servant doctrine and *respondeat superior*, and focuses on the degree of control exercised by the putative borrowing employer. See *Belluomini*, 64 F.3d at 302; *A. J. Johnson Paving*, 412 N.E.2d at 480; cf. *Charles v. Barrett*, 135 N.E. 199, 200 (N.Y. 1922) (Cardozo, J.) ("Neither the contract nor its performance shows a *change of control* so radical as to disturb that duty or its incidence. . . . The rule now is that, as long as the employee is furthering the business of his general employer by the service rendered to another, there will be no inference of a new relation *unless command has been surrendered*, and no inference of its surrender from the mere fact of its division.") (em-

phases added) (citations omitted); see generally J. Dennis Hynes, *Chaos and the Law of Borrowed Servant: An Argument for Consistency*, 14 J.L. & Com. 1, 8-18 (1994); Note, *Borrowed Servants and the Theory of Enterprise Liability*, 76 Yale L.J. 807, 808-13 (1967). In applying the common law test, the Illinois Supreme Court has deemed "the most dominant circumstance in identifying the employer of a loaned employee to be the right to control the manner in which the work is to be done." *A. J. Johnson Paving*, 412 N.E.2d at 480. As a matter of sound policy, it makes sense to hold the employer in control of the conditions of employment primarily liable regardless of fault because the borrowing employer is now in the best position to avoid the risk of workplace accidents. See Note, *Borrowed Servants and the Theory of Enterprise Liability*, 76 Yale L.J. at 808-13; see generally Guido Calabresi, *The Costs of Accidents* (1970). In applying the common law control test, Illinois courts consider "the character of the supervision of the work done, the manner of direction of the employee, the right to discharge, the manner of hiring, and the mode of payment." *Chaney v. Yetter Mfg. Co.*, 734 N.E.2d 1028, 1031 (Ill. App. 2000). In this case, both parties agree that the Postal Service was not a borrowing employer under the common law test because it did not exercise control over the manner of Couch's or his fellow B&B Trucking drivers' work. We turn to the second test.

### 2. The Belluomini Test

The second test incorporates language from the IWCA itself. The statute does not define "borrowing

employer" but it provides a non-exclusive definition of "loaning employer":

> An employer whose business or enterprise or a substantial part thereof consists of hiring, procuring or furnishing employees to or for other employers operating under and subject to the provisions of this Act for the performance of the work of such other employers and who pays such employees their salary or wages notwithstanding that they are doing the work of such other employers shall be deemed a loaning employer within the meaning and provisions of this Section.

820 ILCS 305/1(a)(4). In *Belluomini*, 64 F.3d at 302, we reasoned that the customer of a lending employer is necessarily a borrowing employer, relying on the Illinois Supreme Court's decision in *Chicago's Finest Workers Co. v. Indus. Comm'n*, 335 N.E.2d 434, 436 (1975).[1]

---

[1] The main issue in *Chicago's Finest Workers* was how to apportion liability for workers' compensation between a borrowing employer and a lending employer, not how to identify a borrowed employment relationship under the IWCA. In that case, the existence of a borrowed employment situation was obvious: Chicago's Finest Workers was a "temp agency" that supplied construction workers to a construction contractor named Cozzi. Presented with a quintessential borrowed employment situation, the state supreme court easily rejected Cozzi's argument that he was not a borrowing employer under the common law control test, noting that the "evidence clearly establishes the contrary." 335 N.E.2d at 436. It then

(continued...)

We extrapolated from the statutory language a three-part test for identifying a borrowing employer: "(1) a substantial portion of the alleged loaning employer's business must consist of furnishing employees to do the work of other employers; (2) the loaning employer must pay the employee's wages even though that employee is working for another employer; and (3) the borrowing employer must be operating under the Act." 64 F.3d at 302; accord *Luna*, 454 F.3d at 637. The parties agree that the second and third factors are present here. They dispute the first factor, whether B&B Trucking is in the business of "furnishing employees to do the work of other employers."

Neither *Luna* nor *Belluomini* faced the problem we have here, which is how to distinguish a "loaning employer" from many other contractors who provide services to government agencies. In *Belluomini*, the contractor supplied Court Security Officers who were directed and controlled by the U.S. Marshals Service, and the contractor agreed that it simply provided employees rather than a service. 64 F.3d at 302-03. In *Luna*, the plaintiff worked for a contractor we described as

---

(...continued)
noted, almost as an aside, that the Chicago's Finest Workers agency also met the IWCA's description of a loaning employer at 820 ILCS 305/1(a)(4). *Id.* The court did not identify the loaning employer language in paragraph (a)(4) as a separate and independent test for identifying a borrowing employer, though that is how we read the opinion in *Belluomini*. See 64 F.3d at 302.

"in the business of supplying employees to governmental agencies." 454 F.3d at 633.

For two reasons, we conclude that B&B Trucking is not a "loaning employer" under the terms of the HCR contract and the IWCA. First, B&B Trucking does not "furnish" its employees to anyone else. Second, its employees are not "doing the work of other employers" — they are doing the work of B&B Trucking. In common parlance, to "furnish" means to "provide or supply." See *Webster's Third New International Dictionary* 923 (1993). B&B Trucking is not providing or supplying its drivers to any other employer. It hires drivers and other employees to fulfill its service contract with the Postal Service to transport mail.

How do we know the HCR contract is a service contract? First, it is labeled a contract *for* "mail *service*." That helps. Second, the contract refers to B&B Trucking as the Postal Service's "supplier," and not as a supplier of employees or drivers but rather as a supplier of the "service" of "transportation." Third, B&B Trucking is required to supply certain numbers and types of vehicles, but not a certain number and type of drivers. Fourth, the contract states that "Driver uniforms are not required," and that "Suppliers who require *their* drivers to wear uniforms may include the cost only in the general overhead line." Fifth, the contract requires B&B Trucking drivers to wear a badge labeled "Non Postal Service Contractor Employee."

At a more fundamental level, we ask what the Postal Service is paying B&B Trucking to do. The answer

is not merely to furnish a number of skilled drivers to show up at Postal Service facilities and do what they are told. The answer is that B&B Trucking must actually deliver mail from one place to another, safely and on time. If B&B Trucking and its employees do not provide those services, B&B Trucking does not get paid. In sum, the contract terms indicate that it is one to provide transportation services rather than drivers, that B&B Trucking may perform those services using however many drivers it wishes, and that the Postal Service disclaims those drivers as its own. B&B Trucking does not supply employees, it provides services.

The second reason B&B Trucking is not a loaning employer under the IWCA is that its drivers do not perform the work of the Postal Service, except in the very general sense that it is work the Postal Service hired their employer to do. A business or government agency may contract with other companies to provide a variety of services that could be done by in-house employees or that could be contracted out, such as catering meals, painting, management consulting, legal representation, or security or custodial services.

Let's focus on a contract for legal representation of a business or agency that employs its own in-house attorneys, but decides to hire an outside law firm (not a legal temporary employment agency) to handle certain types of cases or transactions. Like the Postal Service in this case, the business or agency could have its own lawyer-employees do the work instead. No one would suggest, though, that the law firm is merely

"furnishing employees" to its client or that the employees of the law firm assigned to the client are also employees of the client. The same reasoning would apply to the management consultants, the security service, the catering service, the custodial service, or many others, and it applies to B&B Trucking's mail transportation service for the Postal Service. To perform those services, B&B Trucking's drivers are trained by B&B, use B&B trucks, communicate with B&B dispatchers, are supervised by B&B management, and perform the tasks that B&B requires for so long and for such compensation as B&B determines. These drivers are quite clearly doing the work of B&B Trucking in providing services to the Postal Service.

This reasoning should be familiar to the Postal Service. Drivers transporting mail under HCR contracts and other similar contracts cause accidents from time to time. When victims of such accidents sue the Postal Service under the FTCA, the Postal Service uses this same reasoning to show that these drivers are *not* its own employees but independent contractors for whom it bears no legal responsibility. See, *e.g.*, *Hines v. United States*, 60 F.3d 1442, 1446 (9th Cir. 1995) (affirming summary judgment for United States in FTCA action against Postal Service for negligence of driver operating under mail transportation services contract; transport company was independent contractor), abrogated on other grounds by *United States v. Olson*, 546 U.S. 43 (2005); *Norton v. Murphy*, 661 F.2d 882, 885 (10th Cir. 1981) (same); *Tunder v. United States*, 522 F.2d 913, 915 (10th Cir. 1975) (same); *Fisher v. United States*, 356 F.2d 706, 708 (6th Cir.

1966) (per curiam) (same); *Lerma v. United States*, 716 F. Supp. 1294, 1297 (N.D. Cal. 1988) (same); *Duncan v. United States*, 562 F. Supp. 96, 100 (E.D. La. 1983) (same); *Thomas v. United States*, 204 F. Supp. 896, 899 (D. Vt. 1962) (same); cf. *Kwitek v. U.S. Postal Service*, 694 F. Supp. 2d 219, 224-25 (W.D.N.Y. 2010) (in FTCA negligence action brought by HCR contractor's employee against Postal Service, holding that the FTCA independent contractor exception did not bar claim because plaintiff alleged negligence by Postal Service employees, and denying government's motion to dismiss).

As the government would have it, though, HCR drivers are independent contractors when they injure other people but borrowed employees when Postal Service employees injure them, at least in Illinois. This "heads-I-win, tails-you-lose" approach is both unfair and doctrinally incoherent. If the drivers are independent contractors, they cannot be borrowed employees — at least not at common law — because they are not under the Postal Service's control. See, *e.g., Logue v. United States*, 412 U.S. 521, 527-28 (1973) ("the critical factor in making this [independent contractor] determination is the authority of the principal to control the detailed physical performance of the contractor"); *Belluomini*, 64 F.3d at 304 ("The determination of whether a relationship is that of an independent contractor or employer/employee is fact-dependent. Among the factors which we consider are the manner of hiring, the right to discharge, the degree of supervision, and most importantly, the right to control and direct the work done.") (citation omitted); see also Restatement (Second) of

Agency, § 220(2) ("In determining whether one acting for another is a servant or an independent contractor, the following matters of fact, among others, are considered: (a) the extent of control which, by the agreement, the master may exercise over the details of the work. . . ."). The only reason the Postal Service's position in this case is even colorable, of course, is that unlike the common-law control test, under the *Belluomini* test the borrowing employer need not exercise full common law control over the borrowed employee so long as the loaning employer is in the business of "furnishing employees" to other employers.

Under our precedents applying Illinois law, however, this phrase — "furnishing employees to do the work of other employers" — does not apply to a contractor that is responsible for providing a service with employees under its own control. In *Belluomini* itself, we concluded that the U.S. Marshals Service was the borrowing employer of a Court Security Officer (CSO) who was killed in the line of duty. The Marshals Service "hired" the contractor (called GSSC) that hired the CSO "to supply [CSOs] to assist in the protection of the federal judiciary," and we said the contractor was in the business of "supplying security personnel to the government." 64 F.3d at 302, 303. In rejecting the plaintiff's independent contractor argument, we emphasized the degree of control exercised by the Marshals Service over the day-to-day work of the CSOs:

> [I]t is the Marshals Service which has the responsibility for determining how security is provided in

the federal building. This includes the authority to assign duties and stations to individual CSOs. Although GSSC provides a "Lead CSO" for on-site supervision, that officer essentially functions as a liaison between the CSOs and the Marshals Service. The Marshals Service trains and deputizes new CSOs and provides them with their badges and their weapons. GSSC cannot reduce or increase the number of CSOs on site without the Marshals Service's approval. The Marshals Service also retains the authority to discharge CSOs. These factors combine to undermine any claim that GSSC and the Marshals Service had a principal/independent contractor relationship.

*Id.* at 304. *Belluomini* thus determined that CSOs were not independent contractors because the Marshals Service controlled so much of their daily work. That degree of control distinguished the furnishing of employees from the businesses of many other government contractors who provide services, and whose employees are not "borrowed employees."

More recently, in *Luna v. United States*, 454 F.3d 631 (7th Cir. 2006), we applied the *Belluomini* test in a similar context. Plaintiff Luna worked for a consulting company called RCI that provided employees to the Navy to assist with its training courses at the Great

Lakes Naval Base in Illinois.[2] While addressing a large group of recruits, Luna fell and injured her knee. *Id.* at 633. She received workers' compensation benefits through RCI's policy in accordance with the IWCA and then sued the United States for negligence in constructing and maintaining the training facility. This court held that she could not sue under the FTCA. We determined that "RCI easily satisfies the test for a loaning employer" because it was "undisputed that a substantial part of its business involved hiring, procuring, or furnishing employees to do jobs for governmental and private agencies." *Id.* at 637. This made the Navy a borrowing employee under the *Belluomini* test, so workers' compensation was Luna's exclusive remedy.

Thus, in both *Luna* and *Belluomini*, a private company provided personnel to work at federal agencies under the direction of government staff. In *Luna*, the plaintiff was an administrative assistant who acted as a liaison between Navy instructors and Navy recruits. See *Luna v. United States*, 2003 WL 21196227, at *5. In *Belluomini*, the CSOs

---

[2] According to the district court's opinion, the Navy did not exercise formal control over RCI employees, but did supervise their work to some degree and also provided "RCI with office space and facilities, parking spaces, telephone services, utilities, office supplies, computer equipment, computer software, four government vehicles, and other equipment." *Luna v. United States*, No. 00 C 1329, 2003 WL 21196227, at *4 (N.D. Ill. May 21, 2003).

assisted the Marshals Service in providing security at federal courthouses. In each case, the government contracted with a private employer for agency support personnel, and the agency integrated the contractor's employees into its own operations. See *Luna*, 2003 WL 21196227, at *6 ("Naval personnel did have the right to tell Plaintiff how to do her job. For example, Naval personnel could order Plaintiff to change her work location, tell her to use different procedures in carrying out her duties, or instruct her to give students different information.") (record citation omitted); see also *Belluomini*, 64 F.3d at 304 ("[I]t is the Marshals Service which has the responsibility for determining how security is provided in the federal building. This includes the authority to assign duties and stations to individual CSOs.").

Here, by contrast, B&B Trucking contracted with the Post Office to provide not employees but a discrete service. B&B managed its own operation, deployed its own equipment, and trained, coordinated, and supervised its own employees in performing that service. To say that B&B is in the business of "furnishing employees to do the work of other employers" would expand that phrase well beyond both common usage and the factual bounds envisaged by *Belluomini* and *Luna*, and would open up the possibility that all sorts of service contracts could be deemed borrowed employment. It would also unmoor the doctrine of borrowed employment from its settled common law meaning — a meaning we presume the Illinois legislature incorporated into

the IWCA. See *Morissette v. United States*, 342 U.S. 246, 263 (1952) ("And where Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed. In such case, absence of contrary direction may be taken as satisfaction with widely accepted definitions, not as a departure from them."). As Judge Feinerman concluded in a case with materially identical facts, "the summary judgment record here, viewed with all genuine factual disputes resolved in [the plaintiff's favor], indicates that [the HCR contractor] was in the business of furnishing inter-post office transportation services, not employees, to the Postal Service." *Jorden*, 2011 WL 4808165, at *3. We agree. The result should be the same here.

We noted in *Luna* that several decisions of the Illinois Appellate Court have determined that "there is no separate statutory test for a borrowing employer under the IWCA, and that the issue of borrowed employment is a question of fact to be resolved solely by application of the multi-factor 'control test.'" *Luna*, 454 F.3d at 636, citing *Lanphier v. Gilster-Mary Lee Corp.*, 765 N.E.2d 493, 495-96 (Ill. App. 2002); *Chaney*, 734 N.E.2d at 1032; *Crespo v. Weber Stephen Prods. Co.*, 656 N.E.2d 154, 156 (Ill. App. 1995). This may have been an understatement: at least a dozen other decisions of the Illinois Appellate

Court have treated the common law right-to-control inquiry as the only relevant one under the IWCA, without hinting at a separate test based on the definition of loaning employer found in 820 ILCS 305/1(a)(4). See, *e.g.*, *Prodanic v. Grossinger City Autocorp, Inc.*, ___ N.E.2d ___, 2012 WL 2947894, at *8 (Ill. App. 2012); *Kawaguchi*, 835 N.E.2d at 442-43; *Palomar v. Metro. Sanitary Dist. of Greater Chicago*, 587 N.E.2d 1067, 1072 (Ill. App. 1992). Most of these courts relied on the Illinois Supreme Court's two most recent decisions on point, both of which indicate that the common law control test is the exclusive standard of borrowed employment for the purposes of the IWCA. See *A. J. Johnson Paving Co. v. Indus. Comm'n*, 412 N.E.2d 477, 480 (Ill. 1980) ("An employee in the general employment of one person may be loaned to another for the performance of special work and become the employee of the person to whom he is loaned, while performing the special service. Whether such a transfer of employment occurs depends on whether the special or borrowing employer has the right to control the employee with respect to the work performed."); *Saldana v. Wirtz Cartage Co.*, 385 N.E.2d 664, 668 (Ill. 1978) ("The main criterion for determining when a worker becomes a loaned employee is whether the special employer has control of the employee's services."). Although these decisions came after *Chicago's Finest Workers*, we did not consider them in either *Belluomini* or *Luna*. Moreover, no reported decision of an Illinois state court has ever cited *Belluomini* or *Luna*. We have located just two reported cases

that endorse anything resembling the *Belluomini* test, and neither is good authority on this point of law.[3]

We need not reconsider the *Belluomini* test today, for neither *Belluomini* nor *Luna* suggested that the statutory definition of loaning employer might include government contractors like B&B Trucking that provide services rather than employees. As these cases show, the statutory definition of a loaning employer is most useful to ensure that temporary employment agencies and similar businesses are recognized as employers under the IWCA: "An employer whose business or enterprise or a substantial part thereof consists of hiring, procuring or furnishing employees to or for other employers operating under and subject to the provisions of this Act for the performance of the work of such other employers and who pays such employees their salary or wages notwithstanding that they are doing the work of such other employers . . . ." 820 ILCS 305/1(a)(4). This definition does not sweep so broadly as to reach outside contractors like B&B Trucking who provide services to their customers using the contractors' own

---

[3] The first case, *Wasielewski v. Havi Corp.*, 544 N.E.2d 116, 117 (Ill. App. 1989), was expressly overruled on precisely these grounds. See *Lanphier*, 765 N.E.2d at 496. The second case, *Evans v. Abbott Prods., Inc.*, 502 N.E.2d 341, 343 (Ill. App. 1986), assumed in dicta that such a test existed, but the same appellate district has rejected its assumption in later cases. See, *e.g.*, *Prodanic*, ___ N.E.2d at __, 2012 WL 2947894, at *8 ("section 1(a)(4) does not define a borrowing employer").

employees under the direction and control of the con-
tractors' management and using their own equipment.


*Conclusion*

B&B Trucking did not meet the statutory definition of
a loaning employer, so Mr. Couch was not a borrowed
employee of the Postal Service when he was hurt.
The judgment of the District Court is REVERSED and
the case is REMANDED for proceedings consistent with
this opinion.