**Thomas CENSKE, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. 09 C 3651**

United States District Court, N.D. Illinois, Eastern Division.

Signed March 19, 2014

Thomas A. Censke, Terre Haute, IN, pro se.

Gina Elizabeth Brock, Katherine Ellen Beaumont, Kurt N. Lindland, Zachary David Clopton, United States Attorney's Office, Chicago, IL, for Defendant.

## MEMORANDUM OPINION AND FINDINGS OF FACT AND CONCLUSIONS OF LAW

Jeffrey Cole, UNITED STATES MAGISTRATE JUDGE

### INTRODUCTION

Thomas Censke sued the United States under the Federal Tort Claims Act, alleging that he was the victim of an assault and battery by guards while he was incarcerated at the Metropolitan Correctional Center ("MCC") in Chicago.[1] The case proceeded to trial in July 2013, with Mr. Censke proudly announcing that he was "a showman," and saying: "if I were to be my usual showman, I would say like Bugs Bunny, please, your Honor, on with the show."(Tr. 12, 23). And so began a two-day bench trial featuring Mr. Censke and his elaborate tale spun for the occasion.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW [2]

#### A.

Mr. Censke was convicted of and is currently serving time for mailing threatening communications to four individuals associated with one of his previous civil suits, *Censke v. Planned Parenthood,* No. 2:04–cv–301 (W.D.Mich.2004), including a county clerk, a police officer, and two attorneys. *United States v. Censke,* 08–CR–19 (W.D.Mich.2008); Superceding Indictment at Dkt. 37, Judgment at Dkt. 231; Defendant. Ex. 11 at 559; *United States v. Censke,* 534 Fed.Appx. 382 (6th Cir.2013), *cert. denied,* —— U.S. ——, 134 S.Ct. 807, 187 L.Ed.2d 611 (2013). Mr. Censke has a previous felony conviction for aggravated stalking of one of these individuals, attorney Joe Lavey. Defendant. Ex. 11 at 566, 573. Many of his civil suits have been found frivolous and malicious. *Censke v. Smith,* 2007 WL 2594539, at *2 (W.D.Mich. 2007).

During his criminal trial, Mr. Censke moved for a psychological evaluation, and the District Court for the Western District of Michigan ordered him to undergo one pursuant to 18 U.S.C. § 4241. Pl. Ex. 7 at 29; Trial Transcript (Tr. 456). To that end, Mr. Censke was transferred to the MCC on June 16, 2008. Pl. Ex. 18, at 51. For Mr. Censke—or "Censke" (as he referred to himself in closing argument)—this was a ruse, or as he put it "a good opportunity to get away from Michigan and have a brief psych eval and essentially take a vacation in prison, I'll be honest with you. I've had two in the state and didn't need it." (Tr. 456).

It is worth noting that Mr. Censke, who appeared *pro se,* is not a novice in the world of litigation. He is, if not a professional litigant, an experienced and serious hobbyist. Indeed, a Westlaw search re-

---

1. Mr. Censke's claims regarding the conditions of his confinement were dismissed upon initial review pursuant to 42 U.S.C. § 1915A. (Dkt. # 22).

2. *See* Fed. R. Civ. P. 52(a).

veals 21 separate orders by the United States Supreme Court in Mr. Censke's cases. Some of the Court's orders denied *certiorari;* others denied requests for permission to appear *in forma pauperis;* others both simultaneously. For almost every order, there is a corresponding order denying rehearing of whatever order the Court had already issued against Mr. Censke. In 2008, the Court found that Mr. Censke had repeatedly abused the Court's process, and the Clerk was directed not to accept any further petitions in non-criminal matters from Mr. Censke unless the docketing fee was paid and the petition submitted in compliance with the Court's rules. *Censke v. Department of Justice,* 553 U.S. 1016, 128 S.Ct. 2097, 170 L.Ed.2d 815 (2008).

Westlaw also reflects at least 27 opinions by lower courts in Mr. Censke's cases. *See, e.g. Censke v. County of Marquette,* 2013 WL 4499265 (W.D.Mich 2013)(proceeding *pro se* with ADA claim against Marquette County Jail); *United States v. Censke,* 449 Fed.Appx. 456, 459 (6th Cir.2011)(proceeding *pro se* in criminal trial with stand-by appointed counsel); *Censke v. County of Marquette,* 2011 WL 3156280 (W.D.Mich.2011))(proceeding *pro se* with 42 U.S.C. § 1983 claim against Marquette County Jail); *Napier v. Doe,* 2010 WL 201209, at *1 n. 2 (E.D.Mich.2010)(preparing legal documents for a fellow inmate); *Censke v. County of Chippewa,* 2009 WL 1531027 (W.D.Mich.2009)(proceeding *pro se* with 42 U.S.C. § 1983 claim against Chippewa County and the County Sheriff); *Censke v. Ekdahl,* 2009 WL 1393320 (W.D.Mich.2009)(proceeding *pro se* with 42 U.S.C. § 1983 claims against multiple county employees and the State of Michi-

gan); *Censke v. Birkett,* 2009 WL 159160 (E.D.Mich.2009)(proceeding *pro se* with *habeas corpus* petition); *Censke v. Lauren,* 2009 WL 80969, at *1 (W.D.Mich.2009)(proceeding *pro se* with 42 U.S.C. § 1983 claims against multiple county and State of Michigan employees); *Censke v. United States,* 2008 WL 4757321 (W.D.Mich.2008); *Censke v. Tribley,* 2008 WL 2139614 (W.D.Mich.2008)("Plaintiff has been an active litigant in the federal courts in Michigan." (collecting cases)); *Censke v. Calhoun County Jail,* 2007 WL 2323594 (W.D.Mich.2007)(noting that Mr. Censke had filed at least 18 civil cases in the district in just 4 years).

Given this background, it is not surprising that Mr. Censke helps other inmates prepare their own lawsuits. *Napier v. Doe,* 2010 WL 201209, at *1 (E.D.Mich. 2010).

## B.

■ Before turning to Mr. Censke's substantive claims, it is important to make mention of Mr. Censke's skill in representing himself. The Orders denying Mr. Censke's Motion for Appointment of Counsel pointed out that his pre-trial performance, coupled with his extensive background in litigation, demonstrated a high degree of skill and an ability to represent himself in what was an uncomplicated case, which involved an oath-swearing contest between him and those he accused of wrongdoing. [Dkt. 158, 192].[3] At the beginning of the trial, I explained why I thought Mr. Censke was more than capable of trying the case. (Tr. 3). Mr. Censke's performance at the trial confirmed beyond any doubt the accuracy of

---

3. Mr. Censke had all the relevant documents and medical records which revealed what he had complained about over the course of years and revealed the absence of complaints where one would have expected there to be some if his allegations were true. Mr. Cemske was intimately familiar with these records as he showed at trial.

my pretrial assessments. *See, e.g.,* my comments at Tr. 295–96. His performance through the latter half of the trial at least equaled, if it did not exceed, the first half. In short, if Mr. Censke was not sufficiently skilled to handle this case, then no unrepresented non-lawyer could be allowed to represent himself in any civil case. And that is not the law.

## C.

### Mr. Censke's Battery Claim

At the end of his opening statement, having already announced that he fancies himself a "showman," (Tr. 12),[4] Mr. Censke, said: "if I were to be my usual showman, I would say like Bugs Bunny, please, your Honor, on with the show." (Tr. 23). And so, with Bugs Bunny as his muse, Mr. Censke began a performance that had no more substance or truth to it than the pretext he employed so that he could get a "vacation" from the prison in Michigan. Here are the facts.

■ At the MCC on June 27, 2008, Mr. Censke refused to participate in unit sanitation duties. Officer Aaron Jackson handed Mr. Censke a broom, and this irritated Mr. Censke. (Tr. 55–56); 246:12–15. Officer Jackson testified that Mr. Censke insolently threw the broom down. (Tr. 56, 61). Mr. Censke characterized his actions as simply dropping the broom. (Tr. 61, 223). Officer Jackson wrote out an incident report indicating that Mr. Censke had refused to obey an order and being insolent to a staff member. 55–56, 61; Defendant. Ex. 12 at U.S. 444. Mr. Censke testified that, as a pretrial detainee, he was not required to perform sanitation work. (Tr. 245, 247). But, he had

signed a work waiver form stating "would like to volunteer for a work assignment which entails more than housekeeping tasks." Defendant. Ex. 23. For Mr. Censke, that form meant he was open to volunteering for any specific work assignment, not that he was volunteering for any and all such assignments in advance. (Tr. 247–48).

Mr. Censke was then transferred to the Special Housing Unit (SHU) for administrative detention pending resolution of his disciplinary infraction. (Tr. 64; Ex. 12 at U.S. 444). Internal security officer Greg Bynum reported to Unit 13 to transport Mr. Censke to the SHU. (Tr. 64). Inmates are transported between floors by elevator, and internal security is responsible for all inmate movement. (Tr. 418). The inmates are normally handcuffed during transport to the SHU. (Tr. 419). Officer Jackson testified that it is policy to handcuff them when they are being transported for disciplinary reasons, as Mr. Censke was. (Tr. 68). Officer Bynum handcuffed Mr. Censke, behind his back, in an area adjacent to the elevator on Unit 13 and escorted him to the SHU. (Tr. 64, 223, 226, 449).

Mr. Censke testified that Officer Bynum grabbed his wrist and yanked it all the way around forcefully and did not double lock the cuffs which allowed them to close tighter and tighter. (Tr. 223, 343). Mr. Censke claimed that Officer Bynum did so deliberately and with sadistic intent. (Tr. 442). Mr. Censke did not suggest any motive for Officer Bynum to have done so. Mr. Censke did not know Officer Bynum prior to the incident. (Tr. 437).

Officer Bynum testified he has used handcuffs well over 5,000 times in his ca-

---

4. He also referred to himself as a "complete barbarian." (Tr. 246). A medical evaluation that was part of the evidence in this case noted that Mr. Censke appears to "exaggerate

his symptoms in order to 'poke' the criminal justice symptoms [*sic*] as well as to obtain the attention and admiration of others." *Id.* at 384.

reer and that he would not handcuff an inmate in the manner Mr. Censke described. (Tr. 421, 424–25). He demonstrated his handcuffing technique for the court and testified that he always follows the same routine. He handcuffs inmates behind their back with the key holes facing the back of the inmate and the locking pins facing up. (Tr. 421–422). He then places two fingers between the cuff and the inmates' wrist and tightens the cuffs with enough room to remove his two fingers. This ensures the cuffs are not too tight but are tight enough that the inmate cannot pull through the cuffs. He then secures the locking pin to ensure the handcuffs do not tighten. (Tr. 422–423).

Officer Jackson testified he witnessed Officer Bynum place the handcuffs on Mr. Censke from about three feet away. (Tr. 66, 70). Officer Jackson did not see anything unusual, and Mr. Censke did not cry out in pain or say anything suggesting the cuffs were too tight. (Tr. 68, 72–73).

At one point, Mr. Censke testified he remained in handcuffs from the time Officer Bynum cuffed him until the time he entered his cell in the SHU two hours later. (Tr. 237, 339). Moments later he claimed he was in handcuffs for "maybe three hours," from 7:00 until 10:00. (Tr. 237–38). He also claimed it was "at least two and a half hours" or "over two hours." (Tr. 226, 238). At his deposition, Mr. Censke testified that he was kept in handcuffs for about one hour. (Tr. 346–347). At trial, Mr. Censke was confronted with records showing that he left Unit 13 at 8:45 a.m., Defendant. Ex. 21, and was in his cell in the SHU by 9:26 a.m., Pl. Ex. 18, meaning that the correct figure was about 40 minutes. Mr. Censke said he "recognized the mistake [he] made on the timing" and that it was only a "45–minute window." (Tr. 436).

Mr. Censke testified he complained to Officer Roberto Cruz about the tight handcuffs when he arrived at the SHU. (Tr. 227). He explained that he was worried, because he was in for a psychological evaluation, charged with threatening government officials, and it was "a nice dandy little setup, all right." (Tr. 227). Officer Cruz testified that if Mr. Censke had complained about a handcuff injury, he would have personally examined Mr. Censke and would have made a call to for medical attention. (Tr. 385). He further testified that Mr. Censke left Unit 13 at 8:45 a.m. and was in his cell in SHU by 9:26 a.m. (Tr. 383). Mr. Censke's testimony was inconsistent with the way things were done. If he had arrived in handcuffs from a different unit, they would have had to have been removed, if for no other reason than inventory purposes. (Tr. 384). Mr. Censke arrived SHU at 9:00 a.m. (Tr. 381).

Officer Cruz testified he would have placed Mr. Censke in a visual search room, uncuffed him, returned the handcuffs to the internal security officer, required Mr. Censke to remove his clothing, performed a visual inspection of Mr. Censke, issued him new clothing, interviewed him, and re-cuffed him until a cell was assigned. (Tr. 381–82). Officer Cruz's testimony regarding these procedures was consistent with the testimony of Officer Ahmed Henderson, (Tr. 365:21–366:1), and Officer Bynum. (Tr. 419–20).

Mr. Censke testified that his handcuff ordeal—be it 40 minutes, two hours, or three hours—caused him physical pain at a level of 8 or 9 out of 10 for the first 3 or 4 days, and a level of 1 to 2 out of 10 at times after that. (Tr. 335). He claimed his wrist still hurts to this day and the experience haunts him. (Tr. 298, 317). It was "on the verge of being deathly frightening beyond imagined." (Tr. 295). He

testified that when he was brought to his cell, he discussed his injuries with his cellmate, Donald McGuire, telling them the pain was an 8 to a 9. (Tr. 335).

■ Donald McGuire testified by phone. He initially said that he did not "recognize or recollect" Mr. Censke. (Tr. 86). When Mr. Censke reminded him they had been cellmates, Mr. McGuire said, "oh, yes, yes." (Tr. 86). Mr. McGuire testified to the best of his recollection that he first met Mr. Censke on the stairs, and Mr. Censke helped him up the stairs due to Mr. McGuire's infirmities. (Tr. 87). He testified that he recalled when he and Mr. Censke were in segregation, Mr. Censke was in some kind of emotional distress. (Tr. 88). Mr. McGuire attempted to calm him. (Tr. 94. He was not sure how long the distress lasted, whether it was a minute or a couple of days. (Tr. 94). Mr. McGuire then later testified—after some leading questioning from Mr. Censke, that he observed clear physical injuries in the cell in the SHU and he advised Mr. Censke not to let them get infected. (Tr. 97). But Mr. McGuire testified the injuries were to Mr. Censke's legs—he was sure—not his wrists. (Tr. 99). Mr. Censke also asked Mr. McGuire if he recalled Mr. Censke ever refusing medical treatment. He said no. Mr. Censke also asked whether they had a good, friendly relationship. McGuire said that they did, that it was good to this day, and they were still communicating. (Tr. 101).

Mr. McGuire, a former priest, has two convictions involving sexual molestation: a felony conviction by the State of Wisconsin for five counts of sexual assault and a felony conviction in the Northern District of Illinois for two counts of transporting minors. (Tr. 90, 105). He said he was in prison for "false charges." (Tr. 90). Mr. McGuire was defiant when questioned by me (Tr. 93–94), and was clearly biased in favor of Mr. Censke. On the core question of where Mr. Censke was injured, Mr. McGuire got it totally wrong, claiming the injury was to his legs, not his wrists. Given Mr. McGuire's faulty memory, and his convictions—which are admissible under Rule 609, Federal Rules of Evidence (Tr. 270–275)—and his palpable bias in favor of Mr. Censke, I reject his testimony. He claimed not to remember.

Thereafter, Mr. Censke remained at the MCC until August 20, 2008. During the seven weeks he was there, there is no record of any medical treatment for any injury relating to his wrist. (Tr. 252–253, 257, 113, 141); *See also* Defendant. Ex. 3 at U.S. 42–68. He had many opportunities to report his injury. Both Dr. Paul Harvey and MLP (mid-level practitioner) Lida Carrera testified that Mr. Censke could have written a sick call form, could have asked unit staff for assistance in making an appointment, could have informed the administrative staff of a problem during rounds, or could have asked the medical staff for assistance directly during their daily rounds to the SHU unit or in the daily pill line. (Tr. 137–140, 408). Ms. Carrera's testimony is devastating to Mr. Censke's claims. She said that she knew Censke and that she visited his area regularly and that it was her practice to ask the prisoners if they needed help. If they did, she would fill out the form and they would be taken to the doctor. Needless to say, Mr. Censke never complained to her about the "sadistic and intentional" infliction of injury on his wrists and never asked to see a doctor about it.

Mr. Censke claimed there was no way he could have asked for medical treatment "because they wouldn't give [him] anything to write with for several days." (Tr. 252). Although he allowed that medical people "probably came that evening" to his cell, he still did not ask for treatment. (Tr.

252). He didn't recall what he asked them that evening. (Tr. 252).

Mr. Censke knew how to make a "sick call" request. In the wake of his alleged wrist injury—the one that was 8 or 9 out of 10, was deathly frightening, and haunts him to this day—he made two. One was for a chipped tooth a month later on July 28, 2008, Ex. 3 at U.S. 56, and the other was for a three-year-old neck injury on August 8, 2008. Ex. 8 at U.S. 62. He saw MLP Carrera at the MCC on August 8, 2008. MLP Carrera testified that when she saw Mr. Censke he complained of a neck injury that had happened three years ago but did not mention that his wrist had been injured five weeks earlier. (Tr. 400).

Mr. Censke admitted that the first record of any injury to his wrist was almost two and a half years later in November of 2010, when he reported that a prison officer injured him *that day* by improperly using handcuffs. (Tr. 257); *see also* Defense Ex. 3 at U.S. 202. Mr. Censke claimed the Bureau of Prisons simply didn't record any complaint about his wrists prior to that day. (Tr. 258). Yet he did not say he did ask for medical attention and it was not recorded; he said there was no one to ask. (Tr. 252). Also, the Bureau apparently had no qualms about recording his requests for medical attention in July 2008, August 2008, and November 2010. There is even a record of another wrist complaint, in February 2011, at which time there were no significant findings and no apparent distress. (Tr. 257, 259; Ex. 3 at U.S. 202 and 229).

### D.

### Mr. Censke's Assault Claim

Mr. Censke testified that, while he was in the SHU visual search room, Counselor Michael Wright threatened him by saying Mr. Censke "would be a good candidate for sexual assault" and then went to the SHU office to retrieve a tube of ointment which he waved at Mr. Censke. (Tr. 228–229). Mr. Censke had never seen Wright before this alleged event. (Tr. 231–232, 262). He failed to suggest any motive for Mr. Wright to have engaged in a verbal assault.

Mr. Censke testified that Mr. Wright continued to taunt him from the other side of the holding cell door. But, no one ever touched him. (Tr. 262, Tr. 233, Tr. 234). Mr. Censke claimed that, in front of at least three other officers—Cruz, Henderson, and DeSousa—Mr. Wright started "thrusting like a laughing hyena and saying, 'oh, I have somebody fuck you in your white-boy ass, whoo, whoo, whoo' and all this other crazy ghetto crap." (Tr. 213, 236). He further testified that Wright was "laughing, ... screaming, ... humping the air, copulating motions, ... doing all kinds of bizarre things, telling [him] he's gonna have [him] fucked in the ass." (Tr. 233).

Mr. Censke testified he did not fear an attack from any particular person, nor did he have a belief as to when an attack would occur. (Tr. 263). In fact, he explained that he "pressed" Mr. Wright, and told him: "look it, you're as old as I am I can tell by your gray hair, you've got experience with the government, you know what a tort claim and a *Bevins* action is, you'll never hear the end of me...." (Tr. 19). As for whether he was afraid, Mr. Wright would follow through with his threat to arrange to have Mr. Censke raped by a black inmate, he said "you don't know, you can't say ... You don't know what these people are going to do. If they're irrational, they're gonna just do this stuff right in front of three and four other officers and they're all people of color in a city of color...." Mr. Censke was the lone "white guy." (Tr. 232, 263).

Mr. Censke alleged the incident lasted 15–20 minutes. (Tr. 337), Defendant. Ex. 4(a) at U.S. 309. He testified it was as if Mr. Wright went off the deep end like a maniac and then just burned himself out. (Tr. 235–236).

Mr. Wright was working as a correctional counselor and was doing rounds for inmates on his caseload in the SHU Unit on June 27, 2008. (Tr. 185, 186–187). A correctional counselor is responsible for answering inmate questions and assisting inmates with visiting, telephone privileges, and assigning work details. Defendant. Ex. 24. Mr. Wright has approximately 160 inmates on his caseload and is responsible for screening new inmates, arranging legal calls, conducting orientation, getting supplies, passing out stamps, establishing visiting lists, arranging attorney phone calls, helping inmates establish financial responsibility, and helping with inmate grievances and getting problems resolved. (Tr. 186, 195). Mr. Censke was not on his caseload, and Mr. Wright had no reason to interact with Mr. Censke on the day of the alleged verbal assault. (Tr. 208). Mr. Wright denied engaging in any of the conduct Mr. Censke accused him of. (Tr. 210–11).

Officer Henderson, who, according to Mr. Censke, witnessed the event, testified that he has never heard Mr. Wright say anything like Mr. Censke alleged and that he would remember a verbal assault like the one Censke alleges if it had occurred. (Tr. 369–370). Officer Cruz, also alleged to have witnessed the event by Mr. Censke, testified he never heard or witnessed Wright threaten Mr. Censke in any way, Tr. 385, and would not allow a staff member to threaten an inmate. (Tr. 390). Officer Cruz testified that if Mr. Wright spoke in the manner Mr. Censke alleged, he would have remembered it. (Tr. 386).

Mr. Censke alleged the verbal assault affected his mental health. (Tr. 317–318). Yet, during his seven weeks at the MCC, there is no record of him complaining to anyone about an alleged assault or seeking mental health treatment. (Tr. 47). It was not until February of 2010, over a year and a half later, that Mr. Censke mentioned an alleged verbal assault to any mental health professional. (Tr. 345; Ex. 3 at U.S. 265). Mr. Censke claimed that he tried to complain, but there was no one he felt he could talk to. (Tr. 317). This testimony is inconsistent with the testimony of psychologist Dr. Jason Dana, who routinely met with Mr. Censke during his time at the MCC and who got along well with him. Yet, Mr. Censke never reported this alleged incident to Dr. Dana. (Tr. 34).

Mr. Censke offered another excuse for not reporting the verbal assault. He claimed he did not tell anyone about the assault because he was scared. (Tr. 341). But this excuse is inconsistent with his pattern of filing numerous civil lawsuits and making complaints about anything and everything that bothered him. (Tr. 287–288, 349–350, 353). It is also inconsistent with his documentation of a prior complaint that an Officer Osbourne had sexually assaulted him on June 11, 2008, by allegedly grabbing his scrotum twice and punching and patting his buttocks, (Tr. 280–814, Pl. Ex. 3 at U.S. 47); and his own contrary testimony that he *did* complain 10 to 11 times in writing or verbally. (Tr. 323, 350).

Moreover, his demeanor at trial as he testified about the incidents in this case showed no visible signs that he had been affected in the slightest by the claimed wrongdoing. Demeanor and inflection can be critical components of the decision whether to believe a witness. *Anderson v. Bessemer City,* 470 U.S. 564, 575, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985)("When find-

ings are based on determinations regarding the credibility of witnesses, Rule 52(a) demands even greater deference to the trial court's findings; for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said."); *United States v. Schiro*, 679 F.3d 521, 532 (7th Cir.2012); *United States. v. Smith*, 668 F.3d 427, 430 (7th Cir.2012).

■ Indeed, "the demeanor of a witness ... may satisfy the tribunal not only that the witness' testimony is not true but that the truth is the opposite of his story; for the denial of one, who has a motive to deny, may be uttered with such hesitation, discomfort, arrogance or defiance, as to give assurance that he is fabricating, and that, if he is, there is no alternative but to assume the truth of what he denies." *NLRB v. Walton Mfg. Co.*, 369 U.S. 404, 408 (1962). Of course, this does not mean that disbelief of a witness is a substitute for proof. It is not. *Cf., Moore v. Chesapeake & O. Ry. Co.*, 340 U.S. 573, 576, 71 S.Ct. 428, 95 L.Ed. 547 (1951); *United States v. Zeigler*, 994 F.2d 845 (D.C.Cir. 1993).

Mr. Censke's demeanor was revealing. He was forceful, self-satisfied, arrogant, self-assured and utterly unafraid. That demeanor was starkly at odds with what one would expect given the physical and emotional impact of what he had been exposed to by the conduct of those involved in this case. That, coupled with the seemingly irreconcilable inconsistency between his claims of fear as a reason for not having complained in this case and his undeviating pattern of complaining about anything that he found offensive in his jail setting, prompted me to say to him:

THE COURT: You made the statement ... that ... this whole episode ... makes you quirky even to speak about it today....I watched you and I've watched you throughout the last day and a half now. There isn't an aspect of this event about which you've testified that I can see visually has affected you in the slightest. And when you say it makes you quivery—not quirky—quivery even to speak about it, there was no quivering on your part. Your statement was delivered with the same degree of strength and resoluteness that you have manifested uninterruptedly from the beginning until the end of this trial. That is simply my observation of what—of what I saw. As to—and I want you to know where I'm thinking and then you could respond. As to the notion that you were somehow afraid to seek help or to complain, it is to me relevant that you have filed 24 cases around the United States of America so I'm not letting that evidence in to show you're litigious. I don't care how litigious you are. We've got all sorts of people in this country who are litigious and win. And I'm not letting this in to show that because you filed other suits and that you lost universally that therefore it is more likely than not that this case is questionable.

But I do think that long history of litigiousness with letters totaling or complaints totaling sometimes as many as 32 pages very carefully worked out, very carefully supported and uninhibited in their expression of anger about what you say happened is a relevant consideration in considering your credibility in claiming that you did not. Well, you say you tried 11 times but leaving that aside because that's inconsistent with your claim that you were too scared. But leaving that aside, that consistent pattern of behavior of strength, of resoluteness, of utter lack of fear and unin-

hibitedness in your expression in these extraordinary documents that you file I think is a factor that I can consider in assessing your credibility. (Tr. 35).[5]

Mr. Censke, of course, had plenty of explanations—none of which were credible. He said there were no materials with which to document the incident. (Tr. 353). But he made 24 handwritten complaints over the course of his stay, some as long as 32 pages, indicating he had regular access to writing materials. (Tr. 353). He filled out two sick call forms after the incident in question but failed to mention I or the supposed injury to his wrist. Defendant. Ex. 3 at U.S. 56, 58. He said his post-traumatic stress disorder made him avoid talking about these kinds of incidents. (Tr. 317). But Dr. Dana testified that Mr. Censke was not suffering from PTSD during his time at the MCC and in fact, the only information related to PTSD was Mr. Censke's own report of exposure to a traumatic event during his childhood. (Tr. 36).

In short, I reject Mr. Censke's testimony that an assault and battery occurred and that he received injury to his wrist or wrists as alleged in his complaint and as testified to at trial. His testimony was utterly implausible and utterly inconsistent with all of the objective evidence in the case. His conviction cast even further doubt on his credibility. And finally, his demeanor was hopelessly at odds with the tale he attempted to weave—a tale obviously spun for the occasion.

---

5. *See also* (Tr. 349). Mr. Censke's unconvincing, glib response was that he's always amazed that outwardly there are no visual signs of his anxiety or any kind of emotional disturbance. "I've been very schooled in public speaking." "I've been a member of the toastmasters at the top of the world in Anchorage but I feel that inside and I guess, for evidence purposes, I'm sorry it doesn't come out but also very glad but I feel that.

## E.

### Conclusions of Law

The issues presented by Mr. Censke's battery claim against Officer Bynum and his assault claim against Mr. Wright are straightforward and easily resolved. The claims are brought against the United States pursuant to the Federal Tort Claims Act ("FTCA"). Under the FTCA, the United States is liable to the same extent as a private entity under the law of the state where the allegedly tortious act occurred—in this case, Illinois. 28 U.S.C. § 2674; *Couch v. U.S.*, 694 F.3d 852, 854 (7th Cir.2012).

 Under Illinois law, battery is committed by an individual if: (a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) a harmful contact with the person of the other directly or indirectly results. *Flores v. Santiago*, 369 Ill.Dec. 580, 986 N.E.2d 1216, 1219 (1st Dist.2013); *Bakes v. St. Alexius Medical Center*, 352 Ill.Dec. 902, 955 N.E.2d 78, 85–86 (1st Dist.2011)(quoting Restatement (Second) of Torts § 13 (1965)). Illinois courts have stated that battery may be defined as the wilful touching of the person of another or a successful attempt to commit violence on the person of another. *Bakes*, 352 Ill.Dec. 902, 955 N.E.2d at 86 (collecting cases). The contact must be unauthorized. *Id.* Moreover, battery requires more than an intent to contact, in that a defendant must intend to cause a

This claim, your Honor, like all the other twenty-some claims is very well stated and very well preserved. It was a—it's a well written pro se document the same as the others." (Tr. 352–353). I reject Mr. Censke's explanation for a demeanor that belied his claimed reason for not having ever mentioned the allegedly brutal and enduring injuries he claimed he suffered.

harmful or offensive contact. *Bakes,* 352 Ill.Dec. 902, 955 N.E.2d at 86. *See also Chelios v. Heavener,* 520 F.3d 678, 692 (7th Cir.2008)("Under Illinois law, battery is the 'unauthorized touching' of another that 'offends a reasonable sense of personal dignity.' ").[6]

■ Assault necessarily involves a reasonable apprehension of an imminent battery. *Rosenberg v. Packerland Packing Co., Inc.,* 55 Ill.App.3d 959, 963, 13 Ill.Dec. 208, 370 N.E.2d 1235, 1238 (1st Dist.1977); *Kijonka v. Seitzinger,* 363 F.3d 645, 647 (7th Cir.2004)("Ever since the fourteenth century, assault whether civil or criminal has involved (1) a threatening *gesture,* or an otherwise innocent gesture made threatening by the accompanying words, that (2) creates a reasonable apprehension of an *imminent* battery." (emphasis in original)). "Reasonable apprehension" means "a well-founded fear of imminent peril, coupled with the apparent present ability to effectuate the attempt if not prevented." *Parrish by Bowker v. Donahue,* 110 Ill.App.3d 1081, 1083, 66 Ill.Dec. 860, 443 N.E.2d 786, 788 (3rd Dist. 1982). "A merely verbal threat of indefinite action in the indefinite future is not an assault." *Kijonka,* 363 F.3d at 647. *See generally Yang v. Hardin,* 37 F.3d 282, 286 (7th Cir.1994); *Padilla v. Bailey,* 2011 WL 3045991 at *8 (N.D.Ill.2011); *Ewing v. Budget Rent–A–Car Sys., Inc.,* 1993 WL 28738 at *2 (N.D.Ill.1993).

Leaving aside the question of whether Mr. Wright's alleged conduct sufficed to constitute an assault, I find that Mr. Censke has failed to prove either an assault or a battery. First and foremost, his testimony was simply not credible. It is liberally seasoned with inconsistencies and exaggerations, both of which are valid reasons for determining a witness to be not credible. *United States v. Li Xin Wu,* 668 F.3d 882, 888 (7th Cir.2011)(inconsistent statements); *United States v. Jackson,* 370 Fed.Appx. 724, 726–727 (7th Cir.2010)(inconsistent testimony); *Whitehead v. Bond,* 680 F.3d 919, 927 (7th Cir.2012)(exaggerations).

■ As for his battery claim, there is certainly nothing in the record to suggest that Officer Jackson was not authorized to handcuff Mr. Censke during transport to the SHU, and Mr. Censke never claimed otherwise. As for Mr. Censke having been handcuffed for two or three hours, this turned out to be as ridiculous as it sounds. Mr. Censke was forced to concede that his testimony of how long he was kept in handcuffs—for two to as many as three hours—was wildly exaggerated. It was approximately 40 minutes. Mr. Censke made matters even worse by comparing his 40 minutes in *normal* handcuffs to the 8 to 16 hours the prisoner in *Davis v. Peters,* 566 F.Supp.2d 790 (N.D.Ill.2008) was kept in *black box* handcuffs. (Tr. 449). Beyond that, I do not believe that Officer Jackson handcuffed Mr. Censke in the manner Mr. Censke claimed so as to injure hum. Officer Jackson testified credibly as to the manner in which he performs this duty. Mr. Censke, on the other hand, was obviously not a believable witness for the reasons previously discussed.

Moreover, Mr. Censke's testimony as to his injuries due to the handcuffs was highly exaggerated. He said it was frightening and the injuries haunt him to this day.

---

**6.** As to the elements of the *intentional tort* of battery under Illinois law, the government inexplicably relies exclusively on *Kraushaar v. Flanigan,* 45 F.3d 1040 (7th Cir.1995), in which the court found that a corrections officer did not commit an *assault* as defined in the Illinois *Criminal* Code threatening to conduct a strip search because he proved he had the proper authority to do so. 45 F.3d at 1050.

But he never sought medical attention for them. He did not mention the injury when medical staff came to his cell that evening, and he never reported it thereafter. Mr. Censke claims it was because he was not allowed to or because he did not have writing materials to do so. I reject that testimony. He had access to sufficient writing materials to request medical treatment for another issue just a month after the incident. At that time, he did not mention the supposedly excruciating pain he continued to suffer from the handcuffs. And he did not mention it the time after that, and so on. In fact, Mr. Censke had sufficient access to writing materials to, as he put it, "copiously pour paper down th[o]se people's throat[s] like [he] like[s] to do." (Tr. 448).

Mr. McGuire, Mr. Censke's cellmate, could not recall if Mr. Censke's claimed injury troubled him at all—which would surely be odd given the severity of the injury claimed by Mr. Censke. And, McGuire didn't even recall that anything at all was wrong with Mr. Censke's wrists. He was sure it was his legs.[7] It was undisputed that there was nothing wrong with Mr. Censke's legs. Mr. McGuire obviously wanted to lend a hand to his cellmate by testifying, but he simply didn't line up his tale with the one Mr. Censke chose to weave.

 Much the same can be said for Mr. Censke's testimony as to his assault claim. The charge is rather outlandish: a 15 to 20 minute rant by a prison counselor threatening sexual assault. It even included props like a tube of ointment. Mr. Wright credibly testified that no such thing ever occurred, and he would never talk that way to an inmate as it was a terminable offense. Two witnesses corroborated his testimony. Mr. Censke's version simply cannot be credited. Out here "in the world," as Mr. Censke calls it, we are not so naive as to believe that prisoners are never roughly handcuffed or otherwise abused physically by guards. But that a prison counselor would engage a 20–minute, insane diatribe, threatening to have an inmate he had never seen before raped is an unbelievable fabrication. If such a thing had happened, a man like Mr. Censke would have complained to someone.

As with his physical injuries, Mr. Censke never sought treatment for the severe, ongoing psychological trauma he claimed to suffer as a result of the purported assault. He offered various reasons for why he did not, but these were so many dominoes toppled by reality. He claimed there was no one to talk to about it, but he met regularly with a psychologist. He claimed he was afraid to make a complaint, but his extensive record of "copiously pour[ing] paper down [the prison authorities'] throats" demonstrates he has never been one to suffer any slight in silence. That record also belies his claim that he had no access to writing materials. And finally, his demeanor at trial was hopelessly inconsistent with his d story about the alleged assault and with its unremitting impact on his psyche.

In his post-trial submission, Mr. Censke lodges a number of objections to the course of the trial—none of which were made at the time—and a number of arguments. Most of these have already been addressed in the foregoing discussion, but

---

7. The government submits that the fact that Mr. Censke helped Mr. McGuire up the stairs when they first met undermines Mr. Censke's claim that his wrists were injured. But, the testimony they cite regarding that incident does not indicate whether it occurred before or after the handcuff incident. (Tr. 87). No matter, as there is certainly enough outside of that little trifle to seriously undermine Mr. Censke's credibility.

several will be specifically dealt with for the sake of thoroughness. First, Mr. Censke argues that the government witnesses' testimony that the two incidents at issue did not happen as Mr. Censke alleged did not constitute a valid defense and their testimony was mere assumption. [Dkt. # 213, at 1–2]. The testimony was of the witnesses and alleged participants and, unlike Mr. Censke's testimony, was free of inconsistencies and exaggerations.

■ Mr. Censke also claims that I was "deemed HOSTILE in [my] demeanor toward" him and Mr. McGuire as witnesses. [Dkt. # 213, at 2](Capitals in original). The transcript of the trial shows quite the opposite. In fact, Mr. Censke, as is his wont, simply ignores the reality of what occurred. The trial transcript reveals that he repeatedly said what a pleasurable experience he was having in court and how patient and fair I was to him. Indeed, I attempted to make the trial as easy and comfortable for Mr. Censke as possible.

For example, I assured him the trial would be conducted in an informal way and that he would be allowed to conduct his own examination through a narrative without having to resort to the artificial device of asking himself questions. I told him he could testify and question witnesses from wherever in the courtroom he felt most comfortable. (Tr. 2, 214–15). He told me what a pleasure it was to be here. He said if it weren't for the painful experiences that brought us together, "this is wonderful." (Tr. 21). He thanked me for my "patient audience," (Tr. 21), for being polite in allowing him to stretch out part of his presentation "given [his] wordiness." (Tr. 39).

Later in the case, he again thanked me for "being patient" and being "much more than very accommodating." (Tr. 147–49). He expressed his appreciation for the "open forum for this relaxed testimony"

(Tr. 284; *see also* 290, 296, 302), and said: "I really believe you'll be fair." (Tr. 286). Thereafter, he effectively again thanked me for my hospitality in the courtroom, (Tr. 175) and for my patience. (Tr. 286, 302). I told him not to be concerned about the time he was taking, and that he could have all the time he needed to make his presentation and conduct his case. (Tr. 175, 220–221). And, at the close of the case, he thanked me for making a personal inquiry. (Tr. 470).

Mr. Censke next contends that the records show that Dr. Harvey, who was clinical director at the MCC during the pertinent period reported him as a no-show on July 3, 2008, and that Officer Cruz testified that there couldn't have been a no-show if an inmate made a request for medical attention because the guards would take the inmate to the appointment. [Dkt. # 213, at 3]. In fact, the evidence does not show that he was a "no-show," but that he never reported a wrist injury to medical staff. Pl. Ex. 10. Dr. Harvey states that he *saw* Mr. Censke on July 3rd—about a week after the handcuff incident, and he reported no chronic care issues that would require treatment. Pl. Ex. 10, ¶ 5. Unfortunately, false allegations come quite easily to Mr. Censke. But no matter how cleverly made or strenuously urged, they cannot change reality. *Di Santo v. Pennsylvania,* 273 U.S. 34, 43, 47 S.Ct. 267, 71 L.Ed. 524 (1927)(Brandeis, J., *dissenting* ).

■ Additionally, Mr. Censke complains that evidence of both his and Mr. McGuire's prior convictions was wrongfully admitted to impeach their testimony, as the convictions did not involve untruthfulness or fraud. *See* Fed. R. Evid. 609(a); [Dkt. # 213, at 4, 5–6]. But that confuses Rule 608(b) with 609. Mr. McGuire's felony convictions were admissible under Rule 609(a)(1)(A). There were no countervailing considerations under Rule 403 that

would require exclusion. Mr. Censke did not object at trial and his afterthought is wrong. As for Mr. Censke's conviction, he essentially made it a part of his opening and closing soliloquies. And even if he had not, it would have been abuse of discretion not to consider them. But even if one were to ignore the convictions, the outcome of this case would be unaffected.

Mr. Censke also argues that the testimony of the government witnesses who could not recall specific events was inadmissible expert testimony. [Dkt. # 213, at 4]. But the testimony Mr. Censke presumably refers to was admissible under Fed. R. Evidence. 406 ("Evidence of a person's habit ... may be admitted to prove that on a particular occasion the person or organization acted in accordance with the habit or routine practice. The court may admit this evidence regardless of whether it is corroborated or whether there was an eyewitness.").

 Mr. Censke also takes the government to task for not calling all of the witnesses they had available. [Dkt. # 213, at 5]. It is not clear what he is driving at. Parties need not call every witness who can shed light on a matter, *United States v. Balzano*, 916 F.2d 1273, 1294 (7th Cir. 1990), and the government cannot be faulted for avoiding overkill. Mr. Censke also complains that there is no evidence to show that the Bureau of Prisons did not have immediate notice of the battery and the assault [Dkt. # 213, at], so there is nothing in the record to undermine envision claims. What a curious argument! It is precisely because there is no evidence in the record of a single complaint from Mr. Censke that his current claims are called into the most serious question. The evidence was rather overwhelming that had Mr. Censke complained there would have been some record of it. That there was none is a point in favor of the government, not of Mr. Censke.

## CONCLUSION

Mr. Censke has utterly failed to prove his claims of assault and battery. All that the trial showed was that Mr. Censke envisions himself as a "showman"—a master puppeteer, pulling the strings of the hapless participants he had caused to be assembled. But like all bad "shows," this one happily has come to an end and without the rave reviews Mr. Censke was no doubt hoping for.